*210
On Application for Rehearing and After Remand from the Alabama Supreme Court

PER CURIAM.
This court’s opinion of January 16, 2015, is withdrawn, and the following is substituted therefor.
C.C. (“the father”) appeals from a judgment of the Limestone Juvenile Court (“the juvenile court”) to the extent that it terminated his parental rights to J.C. (“the child”) upon the petition of L.J. (“the mother”). We affirm.

Procedural History

“The record reflects that the mother initiated a civil action against the father in the juvenile court in July 2012, requesting that the juvenile court establish the father’s paternity of the child and that that court also terminate the father’s parental rights on the basis that the father had purportedly abandoned the child and had failed to visit with or provide for the material needs of the child. The father, initially acting pro se, filed an answer generally denying the allegations of the mother’s complaint pertinent to her termination request, but he did not deny paternity, and the juvenile court entered on order in September 2012 determining that the father was indeed the biological father of the child. The father, acting through counsel, then amended his answer and asserted a counterclaim seeking joint legal custody, visitation rights, and a child-support award for the benefit of the mother.
“After an ore tenus hearing, at which the mother, the father, and the mother’s mother testified, the juvenile court entered a judgment in March 2013 terminating the father’s parental rights, thereby implicitly denying the relief requested by the father in his counterclaim. The father timely appealed from the judgment of the juvenile court, and the judge of that court certified the record as adequate for review by this court pursuant to Rule 28(A)(1)(a), Ala. R. Juv. P.”
C.C. v. L.J., 176 So.3d 183, 184 (Ala.Civ. App.2013).
On appeal, the father first argued that the juvenile court lacked jurisdiction over the termination-of-parental-rights case. This court, on original submission, agreed and dismissed the appeal with instructions to the juvenile court to vacate its judgment. 176 So.3d at 185. On the mother’s petition for a writ of certiorari, however, the supreme court reversed this court’s decision, holding that the juvenile court did have jurisdiction over the case. Ex parte L.J., 176 So.3d 186, 207 (Ala.2014). The supreme court remanded the cause to this court for us to consider the father’s remaining arguments, which had been pre-termitted by this court on original submission because of our dismissal of the appeal. 176 So.3d at 194.

Discussion

The father argues that the juvenile court erred in terminating his parental rights because, he says, the judgment is not supported by clear and convincing evidence indicating that he was unable or unwilling to care for the child and because the juvenile court should have found that there existed a viable alternative to terminating his parental rights.

Grounds for Termination

Section 12-15-319, Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[ ] of a child [is] unable or *211 unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[ ] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[ ].”
In its judgment, the juvenile court concluded that the mother had presented clear and convincing evidence of grounds for termination; specifically, the juvenile court found that the mother had satisfactorily proven, among other things, that the father had abandoned the child, see 12-15-319(a)(1), Ala.Code 1975, that the father had failed to provide for the material needs of the child, see § 12-15-319(a)(9), Ala.Code 1975, that the father had not maintained consistent contact or communication with the child, see § 12-15-319(a)(ll), Ala.Code 1975, and that the father had not made sufficient effort to adjust his circumstances to meet the needs of the child, see § 12-15-319(a)(12), Ala.Code 1975.
For the purposes of terminating parental rights, “abandonment” consists of
“[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
§ 12-15-301(1),. Ala.Code 1975. “Abandonment implies an intentional act on the part of the parent.” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002). In Ex parte F.P., 857 So.2d 125, 138 (Ala.2003), our supreme court stated that “[t]he defi-jjition of abandonment in [former] § 26-18 — 3(1)[, Ala.Code 1975,].... recognizes excuse as a basis on which to avoid abandonment.”[1] Thus, a juvenile court may premise a finding of abandonment -only upon evidence indicating that á parent voluntarily, intentionally, and unjustifiably committed the actions or omissions set out in § 12-15-301, Ala.Code 1975. H.H. v. Baldwin Cnty. Dep’t of Human Res., 989 So.2d 1094, 1103 (Ala.Civ.App.2007) (opinion on return to remand) (Per Moore, J., with two Judges concurring in the result); but see K.W.J. v. J.W.B., 933 So.2d 1075, 1080 (Ala.Civ.App.2005) (Murdock, J., dissenting) (arguing that the last two types qf abandonment may be found without proof of purpose or intent).
Pursuant to § 12-15-319, a finding that a parent has abandoned a child must be based on clear and convincing evidence. “Clear and convihcing evidente” is “ ‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’” L.M. v. D.D.F., 840 So.2d at 179 (quoting Ala. Code 1975, § 6-11-20(b)(4)). On appeal from ore ten-us proceedings, this court presumes the correctness of the juvenile court’s factual findings. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172 (Aa.Civ.App. 2007). This court is bound by those findings if the record contains substantial evidence from which the juvenile court reasonably could have been clearly convinced qf the fact sought to be proved. See Ex parte McInish,, 47 So.3d 767 (Ala.2008) (explaining standard of review of factual determinations required to be based on clear and convincing evidence).
*212 The relevant evidence submitted at the March 3, 2013, trial shows as follows. The mother testified that the child was born on November 13, 2008. She testified that the father did not contribute to any of the medical or hospital bills associated with the child’s birth, but, she said, he was present at. the hospital for the birth of the child and was listed on the child’s birth certificate. The mother testified that, thereafter, the father,had stayed with her and the child “for a few weeks ... at times convenient for [the father]” and that, during that time, the father would “show up in the evenings.... He’d be there when supper wás on the table but there was no true interaction between [the father] and [the child].” The mother testified that she had once asked the father to change the child’s diaper, but, she said, he had refused, so she had never asked him again. The father did not see the child at all during the 2008 Christmas holidays.. According to the mother, by January 2009, the father had stopped staying with the mother and the child. She testified that the father saw the child only sporadically in the months afterwards and that, even then, his interaction with the child “was very, very limited.”
According to the mother, in 2010, the father remained in contact with her, but he seldom asked abput the child. The mother asserted that, during 2010, the father had stolen items from her garage, had.forged checks in her name, had broken into her house and damaged her property, and had threatened her safety. She testified that, in April 2010, she obtained an ex parte protection-from-abuse order against the father and that, two days after that, he filed a paternity action seeking to establish the paternity of the child, custody, and visitation, although, the mother testified, he had not attempted to visit with the child at all in 2010. The mother testified that, on one occasion, she had arrived home to find the father riding “four-wheelers” nearby. She testified that, at that point, she had informed . the father that they needed to formulate a visitation schedule pursuant to which she would have 24 hours’ notice of any visits the father was contemplating. The father followed that plan on only one occasion. The mother testified that she and the child had visited the .father’s parents on Christmas Day in 2010. According to the mother, the father was present on that occasion, but, she said, he did not interact with the child or give the child any presents.
The mother testified that she did not see' the father after Christmas 2010. She testified that the father had telephoned her in June 2011, leaving a message on her. answering machine, but that she had not spoken with him. According to the mother, the paternity action was dismissed in October 2011,[2] and, she said, since that time, she had not had any contact with the father and the father had not made any attempts to telephone or to visit with'the child. The mother testified that she had never refused any request by the father to visit with the child. She testified that the father had never been alone with the child and that the child did not know the father. According to the mother, although the father had been working as an electrician’s assistant, the father had not contributed to the support of the child other than by giving the mother $80 a few weeks before the trial.
The father admitted that he had not paid any of the medical or hospital bills relating to the birth of the child and that he had not paid child support to the mother after the child’s birth. According to the *213 father, he had given the child birthday and Christmas gifts and had regularly paid household bills while he lived with the mother and the child. He explained that he had attempted to set up some sort of financial arrangement "with the mother after he moved out, which he said was about six or seven months after the child was born, but that they had never reached any agreement. The father testified that he was willing to financially support the child and that he had saved $3,000 for that purpose, but, he said, the mother would, not accept his money because she did not want him to see the child.
The father, testified that, in the months after he moved out, he had visited with the child as long as he and the mother were getting along and she would allow it. He testified, however,, that the mother was jealous and that she would not permjt him to see the child when he was seeing other women. The.father testified that he had made numerous attempts to contact the child by telephone, which attempts, he said, had been thwarted by the mother. He testified that he had filed the 2010 paternity action because the mother was preventing him from seeing the child. The father testified that he had dismissed the paternity action in 2011 because the mother had told him that they could work something out, but, he said, they never did. The father also testified that the mother had threatened him with criminal or other legal action, which, he said, had prevented him from pursuing any visitation with the child. He testified that, in November 2012, he had filed in a different court an action pursuing visitation with the child. The father testified that he’had not seen the child for almost two years, that he had not contacted the mother about the child since October 2011, and that he did not know if the child would know him as his father.
The father maintains that the evidence shows that, after he broke up with the mother in 2010, the mother had purposefully alienated him from the child and that he, therefore, had a good excuse for not visiting with, supporting, or otherwise parenting the child. Hence, the father argues, the juvenile court erred in finding that he had abandoned the child. However, from its own independent weighing of the competing and somewhat conflicting evidence, see Ex parte McInish, supra, the juvenile court reasonably could have determined that the mother had done nothing to prevent the father from developing a parental relationship with the child and that the father had voluntarily, intentionally, and unjustifiably forgone a relationship with the, child, had failed or refused to financially support the child, and had failed or refused to act as.a parent toward the child. This. court may not reweigh the evidence to overturn the judgment of a trial court. See Ex parte T.V., 971 So.2d 1, 9 (Ala.2007).
Section 12 — 15—319(b), Ala.Code 1975, provides, in pertinent part: “A rebuttable presumption that the parents are unable or unwilling to act as parents exists in any case where the parents have abandoned a child and this abandonment continues for a period of four months next preceding the filing of the petition.” The juvenile court found that the abandonment of the child by the father continued until the time of trial. Based on the undisputed testimony that the father had made no effort to contact or to see the child after October 2011, the juvenile court applied the foregoing presumption. The father was given the opportunity to rebut that presumption, but he did not convince the juvenile court that he was able and willing to discharge his parental responsibilities to and for the child. Given the evidence before the juvenile court, and considering that the juvenile court personally observed the wit *214 nesses and was able to better adjudge their credibility, we conclude that the juvenile court did not make any legal error in reaching that determination. See J.C., supra. Therefore, we reject the father’s first argument, i.e., that the juvenile court did not have sufficient evidence of grounds to terminate his parental rights.

Viable Alternatives

In Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990), the supreme court held:
“The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in [former] § 26-18-7[, Ala.Code 1975].[3] Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether' all viable alternatives to a termination of parental rights have been considered.”
Applying that test to this case; the father argues that the juvenile court erred in failing to consider other alternatives to termination of his parental rights, namely, a reintroduction of the father to the child through graduated visitation or maintenance of the status quo.
The requirement that a juvenile court consider viable alternatives arises not from the language of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975, but from the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which provides that “[n]o State shall ... deprive any person of life, liberty, or property, without due process of law.” U.S. Const., Amend. XIV, § 1. In Roe v. Conn, 417 F.Supp. 769, 779-80 (M.D.Ala.1976), the United States District Court for the Middle District of Alabama opined that citizens of this country have a fundamental right to family integrity. Under the Due Process Clause, the government can permanently revoke that substantial liberty interest “only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing.” 417 F.Supp. at 779 (emphasis added). This court incorporated that constitutional requirement in its early jurisprudence regarding the termination of parental rights. See Hunley v. Houston Cnty. Dep’t of Pensions & Sec., 365 So.2d 81, 84 n. 1 (Ala.Civ.App.1978). Eventually, our supreme court affirmed that parental rights could be terminated only when no less drastic remedy existed, see Ex parte Brooks, 513 So.2d 614, 617 (Ala.1987); agreeing with this court’s pronouncement in In re Hickman, 489 So.2d 601, 602 (Ala.Civ.App.1986), that, in order to terminate parental rights, a juvenile court must “find that there exists no viable alternative to termination of the parents’ custodial rights.” See Ex parte Ogle, 516 So.2d 243, 243 (Ala.1987).
After Roe, the United States Supreme Court clarified that the full constitutional protection afforded by the Due Process Clause does not extend automatically to unwed fathers by virtue of their biological connection to a child. In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the Supreme Court explained that the Due Process Clause protects only actual established familial relations from unwarranted governmental interference.
“When an unwed father demonstrates a full commitment to the responsibilities of parenthood by ‘com[ing] forward to participate in the rearing of his child,’ Caban [v. Mohammed], 441 U.S. [380] *215 at 392 [ (1979) ], his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he ‘act[s] as a father toward his children.’ Id., at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. ‘[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in “promoting] a way of life” through the instruction of children as well as from the fact of blood relationship.’ Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844 (1977)(quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233 (1972)).
“The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child’s best interests lie.”
463 U.S. at 261-62 (footnotes omitted). In reaching its decision, the Supreme Court quoted with approval an excerpt from Note, 58 Neb. L.Rev. 610, 617 (1979), stating: “ ‘[A] putative father’s failure to show a substantial interest in his child’s welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents.’ ” 463 U.S. at 261 n. 17.
Based on the reasoning in Lehr, an unwed father who voluntarily, intentionally, and unjustifiably fails or refuses to assume a parental role is not entitled to the constitutional protection afforded by the Due Process Clause. See J.B. v. Jefferson Cnty. Dep’t of Human Res., 869 So.2d 475, 483 n. 7 (Ala.Civ.App.2003) (plurality opinion) (citing Lehr and noting that a natural father who has abandoned his child and who has not forged a substantial relationship with his child thereby loses due-process and statutory rights normally associated with the parent-child relationship). Hence, an unwed father who abandons his child such that he does not have any meaningful relationship with his child does not have a due-process right to compel the state to exhaust all viable alternatives before terminating his parental rights. More specifically, the state does not have a duty to give an unwed father a fresh opportunity to develop a relationship with his child after he has already intentionally squandered his first opportunity.
Our holding finds support in Ala.Code 1975, § 12-15-319(a)(l), which provides that, in cases of abandonment, “proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.” In cases in which state action separates the family, the state, ordinarily must use reasonable efforts to restore the family in order to honor the due-process concerns first raised in Roe, supra. But it is the parent, not the state, that disrupts the family when the parent abandons the child, and that parent cannot claim that due process requires corrective state action. Thus, our legislature has *216 determined that the state- owes no duty to reunite the- family in such circumstances. By extension; the state also owes no duty to a parent who has abandoned a child- to explore ways to forgo termination of a familial relationship, which, by the design of the parent, no longer exists.
When the supreme court, in Ex parte Beasley, supra, formulated the two-pronged test, it did not consider the question whether an unwed father who has abandoned his child has a due-process right that requires a juvenile court,to implement other viable alternatives before terminating his parental rights. In fact, the supreme court specifically noted that the merits of the second prong of the test would have to be considered on remand to this court. 564 So.2d at 955. Thus, none of the operative language in Ex parte Beasley contradicts our holding in this case.
We are also convinced that our decision is not precluded by the holding in Ex parte Brooks, 513 So.2d 614 (Ala.1987). In that ease, the evidence showed that the father had divorced the mother when she was three months pregnant because he did not want the child, and that the father had never supported or contacted the child after his birth. Despite the undisputed evidence of abandonment, the juvenile court refused to terminate the parental rights of the father on the ground that the child’s rights to support, inheritance, and future paternal affiliation would be lost, which,' it concluded, was not in the best interest of the child. This court reversed the judgment. See In re Stephenson, 513 So.2d 612 (Ala.Civ.App.1986). On- certiorari' review, the supreme court determined that “the principal question before [the supreme court] is whether a parent’s child support obligations may be waived by a joint petition for termination of parental rights.” 513 So.2d at 616. The supreme court assumed that a- judgment terminating the parental rights of the father would automatically absolve him of his duty to support the child, id., which would not be-in the best interest of the child. 513 So.2d at 617. The court, acknowledged that the evidence proved that the father had abandoned the child,-but it held that “termination of his parental rights appears to be overwhelmingly for the convenience of the parents.” Id. It thus reversed the judgment of this court.
In Ex parte M.D.C., 39 So.3d 1117 (Ala.2009), the supreme court held-that a judgment terminating parental rights does not terminate the parental obligation to provide child support.. That holding severely undermines the reasoning in Ex parte Brooks, supra. Moreover, the supreme court did not consider in Ex parte Brooks the precise issue at stake, in this case — whether a parent who has abandoned a child has a due-process right to consideration of viable alternatives — because, it appears, that issue was not raised in that case. We are convinced that, upon a full consideration of that issue, our supreme court would conclude, as we have, that a noncustodial parent who has abandoned his or her child does not have a sufficient familial relationship that merits due-process protection and that a juvenile court may terminate the parental rights of that parent without exhausting other viable alternatives if to do so would be in the best interest of the child..
In this case, as found by the juvenile court, the father abandoned the child. As a consequence, the father lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating the father’s parental rights. The father cannot now complain that his parental rights are being terminated without the state first attempting to reintroduce him to the child he had *217 long ago forsaken or that the state should maintain what is, at best, only a legal relationship to the child based on a bare biological connection.
The judgment of the juvenile court is affirmed.
APPLICATION GRANTED; OPINION OF JANUARY 16, 2015, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
All the judges concur.

. Former § 26-18-3(1) is now current § 12-15-301(1).

. The mother testified that the father had agreed to dismiss the paternity action in exchange for her dismissal of the protection-from-abuse action.

. Former § 26-18-7 is now current § 12-15-319.