MOORE, Judge.
L.L. (“the mother”) appeals from a judgment entered by the Lee Juvenile Court (“the juvenile court”) terminating her parental rights to T.L. (“the child”). We affirm.

Procedural History

On August 20, 2012, the juvenile court entered a judgment that, among other things, adjudicated the child to be dependent, awarded legal and physical custody of the child to T.W., and awarded the mother visitation with the child, to be supervised by T.W., on Mondays of each week at such time and place as agreed between the mother and T.W. On December 18, 2014, T.W. and her husband, J.W., filed a petition to terminate the mother’s parental rights to the child. On February 17, 2015, the mother answered the petition and counterclaimed for a modification of her visitation with the child. A trial was held on March 31, 2015. On April 3, 2015, the juvenile court entered a judgment terminating the mother’s parental rights. On April 10, 2015, the mother filed her notice of appeal.

Facts

T.W. testified that she is not related to the mother or the child and that she was simply an acquaintance of the mother’s; specifically, the mother lived near T.W.’s grandmother, the mother attended high school with T.W., and the mother had patronized T.W.’s beauty parlor. T.W. testified that she had begun assisting the mother from the time the mother was pregnant with the child. The child was born on March 2, 2011. T.W. testified that she had gone to the hospital with the mother when she gave birth to the child and that she had purchased items for the child. T.W. testified that the mother had telephoned her on the day the mother went home from the hospital and said that she could not “take it” and that her nerves were “bad.” T.W. testified that the mother had telephoned her again the next day stating again that her nerves could not “take it.” She testified that she could hear the baby screaming in the background. T.W. testified that she went to the mother’s house and found that the child had not been fed and that she needed to have her diaper changed-. T.W. testified that she *271 had taken the child into her home when the child was five days old and that she had cared for the child off and on from that point forward.
Armanda Pace, who was employed as a family-preservation worker for the Lee County Department of Human Resources (“DHR”) in 2011, testified that DHR had become involved with the mother’s other two daughters on November 2, 2011, due to allegations of drug use in the mother’s home. Pace testified that the mother’s live-in boyfriend had had guns in the mother’s house at that time and that he had subsequently been arrested on an outstanding warrant from another county. Pace testified that the mother has mental-health problems and that DHR had been concerned that she had been involved with two men who were criminals. The children were removed from the mother’s home and placed with relatives pursuant to a safety plan. Pace testified that DHR had later discovered that the mother had a third daughter, the child, and that the child was already living with T.W. and J.W. The child continued to live with T.W. from November 2, 2011, forward.
The child and the child’s two sisters were adjudicated dependent on August 20, 2012. Custody of the child was awarded to T.W., and custody of the child’s sisters was awarded to their respective paternal relatives. Pace testified that the reunification process had not been successful ■ and that DHR had closed its case file involving the family in January ,2013 due to lack of progress.
T.W. testified that she and J.W. had initiated and supervised visitation between the mother and the child after DHR closed its case file. She testified that the child had had night terrors after the visits, which, she said, she had attributed to the mother’s using a loud aggressive voice and cursing during the visits. :T.W. testified that, during a visit -in May 2013; the mother had told her and J.W., in the presence of the child, that she was pregnant with the child’s brother and that she was considering “killing” the baby. T.W. testified that, after that visit, she had decided the visits were not healthy for the child and that she would no longer initiate the visits but, instead, would wait for the mother to do so.
T.W. testified that, after the May 2013 visit, the mother had not contacted .her again until October 2013 and that, during that conversation, the mother had begun cursing at her. She -testified that she had told the mother at that time to ■ contact T.W.’s attorney if she wanted to visit the child. According 'to T.W., the mother had not contacted her since that time. ;T.W. testified that the mother had not had any contact with the child from May 2013 until two weeks before the trial, at which time she had had a supervised visit with the child.at “Family Connections.” T.W. testified that , the mother had not provided any support or gifts for the child other than a few food and drink items- she had bought the child on one occasion.
T.W. testified that she and J.W. had initiated proceedings to adopt the child. She testified that, if they were allowed to adopt the child, the child could be added to their health-insurance plan instead of being on Medicaid. She also testified that it would benefit the child to share her -and J.W.’s last name. T.W. testified that she had maintained a relationship with the custodians of the child’s sisters ¡so that the sisters could have contact with one another. C.M. testified that she had been serving as the custodian for one-of. the child’s sisters, T.A., that the mother had not regularly visited with T.A., and that, in fact, the mother had visited fewer than 10 times in 1 year. She further testified, that the *272 mother had gone as long as five months without contacting T.A.
The mother testified that, when her youngest child, a son, was born in November 2013, DHR had become involved and had removed the son pursuant to a safety plan. She testified that DHR had later returned her son to her custody and that DHR’s case file regarding the son had been closed. She testified that, at the time of the termination trial, she had her own trailer and was employed. She admitted that she had lived at three different addresses since her son was born in November 2013. She also admitted that she had not talked to D.A., one of the child’s sisters, in three or four months. The mother testified that the child does not know who she is, that the child needs to know who her mother is, that she could be a positive influence in the child’s life, and that she wanted to have visitation with the child. The mother disputed T.W.’s. testimony that she had not contacted her or requested visitation with the child. She testified that T.W. had prevented her from visiting with the child and that T.W. had not returned her telephone calls. She testified that she had notified DHR that she was being denied visitation by T.W. and that she had been told to file a motion with the juvenile court; she stated that she had not filed anything at the time because she had still been trying to get herself together.
Sade Johnson, a “Special Deliveries” therapist for East Alabama Mental Health, Family and Children Services, testified that she had worked with the mother for over a year after the mother had been referred for help parenting her son. She testified that the mother had improved greatly in that she was employed, had maintained housing, had been taking the medication prescribed for her mental-health issues, and had made improvements with regard to her anger-management issues.

Standard of Review

“In reviewing factual findings in termination-of-parental-rights judgments, this court has a narrow standard of review that allows us to disturb those findings only when they are so unsupported by the evidence as to be plainly and palpably wrong. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). If a fact-finder reasonably could have been clearly convinced from the evidence in the record that a parent is unwilling or unable to discharge his or her parental responsibilities to and for the child, this court may not reverse a judgment terminating parental rights arising from ore tenus proceedings in a termination-of-parental-rights case. See J.B. v. DeKalb County Dep’t of Human Res., 12 So.3d [100,] at 111 [(Ala.Civ.App.2008)].”
M.H. v. Jefferson Cnty. Dep’t of Human Res., 42 So.3d 1291, 1294 (Ala.Civ.App.2010).

Discussion

On appeal, the mother first argues that the juvenile court erred in finding the child dependent.
“[U]nless the petitioner is a parent of the child, the court must make a ‘finding of dependency.’ [Ex parte Beasley,] 564 So.2d [950] at 954 [ (Ala.1990) ]. For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights, including but not limited to the grounds specified in § 26-18-7 [repealed and replaced by § 12-15-319, Ala.Code 1975]. 564 So.2d at 954. After making a finding of dependency, the court must ensure that ‘all viable alternatives to a termination of parental rights have been considered.’ 564 So.2d at 954.”
*273 Ex parte T.V., 971 So.2d 1, 4-5 (Ala.2007) (footnote omitted).
Section 12-15-319(a), Ala.Code 1975, provides, in pertinent part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.”
“Abandonment” is defined as:
“A voluntary and .intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
§ 12-15-301(1), Ala.Code 1975. In the present case, the juvenile court found that the mother had abandoned the child. Clear and convincing evidence supports that finding. Specifically, the mother gave the child to T.W., an acquaintance of the mother’s, to care for when the child was an infant. T.W. testified that the mother, inexcusably, had not contacted the child in approximately a year and a half and had never supported the child. Although the mother disputed some of T.W.’s testimony, the juvenile court could have reasonably resolved that factual dispute in T.W.’s favor. See M.H., 42 So.3d at 1294.
The mother also argues that the juvenile court erred in terminating her parental rights despite a lack of evidence that reasonable efforts at rehabilitation had failed; however, in cases of abandonment, a juvenile court can terminate parental rights even in the absence of proof that the state has used reasonable efforts to- rehabilitate the parent and reunite the family or that those efforts had failed. See § 12-15-319(a)(l).
The mother finally argues that the juvenile court erred in finding there were no viable alternatives to termination of her parental rights. In C.C. v. L.J., 176 So.3d 208 (Ala.Civ.App.2015) (opinion on application for rehearing and after remand from the Alabama Supreme Court), this court explained that a parent ordinarily has a substantive and fundamental right to continued association with his or her child that the state may not terminate without first exhausting all viable alternatives. 176 So.3d at 214 (citing Roe v. Conn, 417 F.Supp. 769, 779-80 (M.D.Ala.1976)). However, according to Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), that substantive due-process right does not arise when the parent has only a biological, as opposed to a developed parental, relationship with the child. In C.C., we held that
“a noncustodial parent who has abandoned his or her child does not have a sufficient familial relationship that merits due-process protection and that a juvenile court may terminate the parental rights of that parent without exhausting other viable alternatives if to *274 do so would be in the best interest of the child.”
176 S‘o.3d at 216. This court reasoned:
“In this case, as found by the juvenile court, the father abandoned the child. As a consequence, the father lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating the father’s parental rights. The father cannot now complain that his parental rights are being terminated without the state first attempting to reintroduce him to the child he had long ago forsaken or that the state should maintain what is, at best, only a legal relationship to the child based on a bare biological connection.”
176 So.3d at 216-17. Although C.C. involved an unwed father, the same analysis applies to a natural mother who has intentionally and unjustifiably failed to act as a parent by abandoning her child.
Like the father in C.C,, the mother, by abandoning her child, “lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating [her] parental rights”. Id. The mother may not now complain that she should be reintroduced to the child, who, at the time of the trial, she had not seen in almost two years. Id.

Conclusion

Based on the foregoing, we affirm the juvenile court’s judgment terminating the mother’s parental rights to the child.
AFFIRMED.
THOMPSON, P. J„ and PITTMAN, THOMAS, and DONALDSON, JJ., concur.