Rel: March 10, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

### 2210352

_____

### K.G.

### v.

### J.T.

### Appeal from DeKalb Juvenile Court
### (JU-21-203.01)

FRIDY, Judge.

K.G. ("the mother") appeals from a judgment of the DeKalb Juvenile Court ("the juvenile court") terminating her parental rights to G.G.T. ("the child"), the child she had with J.T. ("the father"). For the reasons discussed herein, we reverse the judgment.

Background

The child was born after the mother and the father engaged in a relationship that lasted about three months, according to the father. Although the father was aware that the mother was pregnant, he had no involvement with the child's prenatal care. When the child was born in November 2019, the father said, he and the mother informally shared physical custody, and the child stayed with him three or four days a week.

The mother was arrested on drug charges in Jackson County on April 28, 2020, about six months after the child was born. On that day, the child was visiting with her maternal aunt, but the mother's older child, the child's half sibling, was present when the mother was arrested. Because the child's half sibling was in the house while the mother was in possession of illegal drugs, the mother said, the charges against her included chemical endangerment of a child. The father said that the mother told social workers with the Jackson County Department of Human Resources ("DHR") that she did not know how to get in touch with him, so, the father said, he was not contacted until the next day. The child has been in his custody since that day. The child's half sibling is in the custody of his own father, and the mother has maintained

contact with that child throughout the events in this case. At trial the mother said that she had been visiting the half sibling every weekend.

Upon the mother's arrest, she was incarcerated in the Jackson County jail. At first, she said, she spoke with the father on the telephone and wrote him letters. However, she said, when he filed an action seeking sole physical custody of the child, he stopped taking her telephone calls and did not respond to her attempts to reach him, including a letter she said that she mailed to him telling him that she was going to receive substance-abuse treatment. In the custody action, the father was awarded custody, and the mother was ordered to pay $247 each month in child support. The mother said that she was not aware of the judgment until after the father filed the action to terminate her parental rights.

While the mother was in the Jackson County jail awaiting trial on the drug charges, she was asked to take part in Jackson County Family Wellness Court ("the FWC"). She pleaded guilty to the charges against her and then, through the auspices of the FWC, she left the jail to begin an inpatient substance-abuse-treatment program, New Life for Women ("New Life"). She said that she attempted to call the father from New

Life, but, because he did not answer or return the telephone call, the mother had not been permitted to make additional calls to him.

The mother was dismissed from the New Life program after about six months because, she said, she accepted a vape smoking device from an unrelated person, despite knowing that she was allowed to accept items from only family members. She testified that she did not know that her receipt of an item from someone other than a family member would result in her dismissal from the program.

After being dismissed from New Life, the mother, still pursuant to an order of the FWC, entered a second inpatient-treatment facility called The Father's House, in Geraldine. The mother said that, after changing facilities, she tried to call the father several times at different telephone numbers, including the father's number and the family's home telephone number. In fact, witnesses from The Father's House testified that staff members assisted the mother in attempting to contact the child "many times" through the father, to no avail. Anna Corbitt, a counselor at The Father's House, testified that she assisted the mother in addressing, stamping, and mailing at least ten letters to the father in which the mother sought to contact the child. The father claimed he received only

two letters from the mother while she was in jail and then one additional letter.

The mother said that because she did not have an appropriate family member who could pick her up, she was not permitted to leave the facility to visit the child. The mother sent a handwritten letter to the juvenile court requesting visitation with the child. The letter was treated as a motion for visitation. The first hearing on that motion was continued, the mother said, and, because she moved from The Father's House after completing its program, she did not receive notice of the next scheduled hearing until after that hearing had been held. Because she failed to attend the hearing, she said, her motion was dismissed. The mother was not represented by counsel at the time, and, she said, she did not realize that she had any options available after the dismissal.

The mother said that the day that she successfully completed the program at The Father's House, she went to the father's parents' house, where she believed the child was living with the father. The paternal grandfather was the only one home at the time, and it is undisputed that he advised the mother not to return to the house until the court reached

a decision. The mother said she was afraid she would be arrested for trespassing if she returned, so she did not go back.

The mother explained that, at both treatment facilities, she was not permitted free access to the money she had earned in the various jobs she held while in treatment. New Life for Women did not permit her to work at all for the first three months she was in residence. At The Father's House, the mother said, she was not permitted to work during her first two months in residence. Both programs had taken a percentage of the mother's wages -- 80% at New Life and 60% plus a 10% tithe at The Father's House -- for room and board, then held the remainder of the mother's earnings for her.

The undisputed testimony was that, at The Father's House, a resident could not be released from the program successfully until she had sufficient money to purchase transportation and obtain a place to live independently. The mother testified that, even after learning that she had to pay child support and that she had $50 she could have used toward paying child support, she believed that "it would be best that I stabil[ize] myself so I can provide for [the child] better." She made a number of similar comments regarding why she did not pay child support

6

after learning of the judgment ordering those payments. She made clear that, while she was saving money through the program, she did not spend any money on things for herself.

Witnesses from the FWC and The Father's House testified on behalf of the mother, saying that she had been an "excellent" and "amazing" participant in their programs. The counselors from The Father's House said that, based on their experience, they did not believe that the mother would relapse. They emphasized the support structure that the mother had in place, even though she could not rely on her family. Those witnesses also testified to the mother's successful completion of programs offered to her during her time in FWC and at The Father's House, including parenting classes and anger-management classes (although there was no indication that she needed those classes), as well as drug-counseling sessions and general counseling sessions.

The father testified that he believed that the mother's parental rights should be terminated because, he said, he did not trust the mother or any of the witnesses who testified on her behalf. He said that it would be unfair for the child if the mother returned and "messed up" the child's life, the father's mother's life, or his fiancée's life. He testified that he and

his fiancée were planning to marry in August 2022 and that his fiancée then intended to adopt the child, if the mother's parental rights were terminated.

On January 18, 2022, the juvenile court entered a judgment terminating the mother's parental rights to the child. The juvenile court found that the mother had abandoned the child, had failed to provide for the child's material needs or to pay a reasonable portion of support for the child despite having the means to do so, had failed to maintain consistent contact with the child, and had "showed lack of effort to adjust her circumstances to the meet the needs of the child in every instance."

The mother filed a timely motion to alter, amend, or vacate the judgment. The same day, she filed a notice of appeal, which was held in abeyance until the juvenile court denied her postjudgment motion. See Rule 4(a)(5), Ala. R. App. P.

## Analysis

In analyzing an appeal involving the termination of parental rights, we begin with the premise that "[t]he right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution." Bowman v. State Dep't of Hum. Res., 534 So. 2d 304, 305

8

(Ala. Civ. App. 1988). As this court has acknowledged on many occasions, "'the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated.'" D.J. v. Etowah Cnty. Dep't of Hum. Res., 351 So. 3d 1067, 1074 (Ala. Civ. App. 2021) (quoting D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 445 (Ala. Civ. App. 2003), quoting in turn V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998)). Indeed, as our supreme court has written, "Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances." Ex parte Beasley, 564 So. 2d 950, 952 (Ala. 1990).

The mother contends that the grounds the juvenile court found for terminating her parental rights were not supported by clear and convincing evidence. A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high

9

probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), this court is required to determine "whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016).

Here, the juvenile court found that the mother had abandoned the child, had failed to provide for the material needs of the child or to pay reasonable support when she had been able to do so, had failed to maintain consistent contact or communication with the child, and had showed a lack of effort to adjust her circumstances to meet the needs of the child in every instance.

For the purposes of terminating parental rights, "abandonment" is defined as

> "[a] voluntary and intentional relinquishment of the custody
> of a child by a parent, or a withholding from the child, without
> good cause or excuse, by the parent, of his or her presence,
> care, love, protection, maintenance, or the opportunity for the

display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

§ 12-15-301(1), Ala. Code 1975. "Abandonment implies an intentional act on the part of the parent." L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002). In C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015), this court observed that Alabama appellate courts have recognized that the definition of "abandonment" for purposes of termination of parental rights contemplates excuse as a basis on which to avoid abandonment.

The mother presented testimony, corroborated by witnesses from the FWC and The Father's House, that she made numerous efforts to contact the child during her time in jail and at the facilities, and then made a visit to the father's house to see the child the day she was released from The Father's House. There was evidence the father stopped taking the mother's calls at one point, and he admitted that he did not attempt to contact the mother to facilitate visitation, even after she came to his house after her release from The Father's House. He also never attempted to have the child visit with her half sibling. As one witness noted, the father put up roadblocks to prevent the mother from having contact with the child. We cannot conclude, based on this evidence, that the juvenile court had before it evidence that reasonably could have

11

clearly convinced it that the mother had abandoned the child through voluntary lack of communication or that her constitutional rights to be a parent to her child were due to be terminated for a failure to maintain consistent contact with the child.

The evidence also indicates that the mother did not have control over her finances while she was a resident in the treatment facilities. She was not aware of the judgment ordering her to pay child support until she was at The Father's House. She said that she could not successfully leave the program at the facility until she had transportation and had obtained a place to live, so she opted to put all of her money toward buying a car because, as she said, she believed that the best thing for her to do "was to better myself so that I could better [the child]. That's the whole thing we were told." Based on the record, we cannot conclude that the evidence before the juvenile court reasonably could have clearly convinced it that the mother's constitutional rights to be a parent to her child should be terminated for voluntarily failing to provide for the child's material needs or that she had abandoned the child by failing to make support payments for the child.

Moreover, contrary to the juvenile court's determination that the mother "showed lack of effort to adjust her circumstances to meet the needs of the child in every instance," the evidence shows that the mother availed herself of every opportunity to improve her circumstances so that she could also better the child's circumstances. If the mother had been making as much progress under programs offered by a county Department of Human Resources instead of the FWC and the treatment facilities, there would be no question that she had made substantial progress toward removing barriers to reunification with the child.

We are cognizant of the fact that the record is not entirely devoid of evidence that would support the juvenile court's judgment, and we are likewise cognizant that it is not the role of this court to reweigh the evidence in determining whether to uphold or reverse the juvenile court's judgment. With that in mind, however, we are firmly convinced that the evidence presented by the father, when weighed against evidence in opposition, could not produce in the mind of a reasonable fact finder a firm conviction that the mother voluntarily and intentionally relinquished custody of the child, that she withheld from the child, without good cause or excuse, her presence, care, love, protection, or

maintenance, that she had failed to provide for the material needs of the child or to pay reasonable support when she was able to do so, that she had failed to maintain consistent contact or communication with the child, or that she had shown a lack of effort to adjust her circumstances to meet the needs of the child in every instance. In short, we conclude that no reasonable fact finder could be clearly convinced that this case involves circumstances so egregious as to warrant the drastic measure of terminating the mother's parental rights.

For these reasons, the judgment is reversed, and the cause is remanded to the juvenile court for entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, Edwards, and Hanson, JJ., concur.

Thompson, P.J., dissents, with opinion.

THOMPSON, Presiding Judge, dissenting.

The record sets forth other facts that are not specifically mentioned in the main opinion and that support the DeKalb Juvenile Court's decision.

> "Because appellate courts do not weigh evidence, particularly when 'the assessment of the credibility of witnesses is involved,' Knight [v. Beverly Health Care Bay Manor Health Care Ctr.], 820 So. 2d [92,] 102 [(Ala. 2001)], we defer to the trial court's factual findings. 'The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court's findings because of that court's unique ability to observe the demeanor of witnesses.' Id.; see also Fitzgerald v. Jeter, 428 So. 2d 84, 85 (Ala. Civ. App. 1983), and Ex parte Fann, 810 So. 2d 631, 633 (Ala. 2001)."

J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1185 (Ala. Civ. App. 2007). See also A.T. v. A.G., 81 So. 3d 385, 389 (Ala. Civ. App. 2011) ("'"[B]ecause the trial court has the advantage of observing the witnesses' demeanor and has a superior opportunity to assess their credibility, this Court cannot alter the trial court's judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong."'" (quoting Ex parte Fann, 810 So. 2d 631, 636 (Ala. 2001))). Although this court might not have reached the same result as did the juvenile court, the record contains sufficient evidence to support the juvenile court's judgment. I would affirm the juvenile court's judgment.