Rel: September 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

### CL-2024-0301 and CL-2024-0302
_____

### D.M.

### v.

### Dale County Department of Human Resources

### Appeals from Dale Juvenile Court
### (JU-20-168.03 and JU-20-169.03)
_____

### CL-2024-0303
_____

### D.D.

### v.

### Dale County Department of Human Resources

### Appeal from Dale Juvenile Court
### (JU-20-169.03)

CL-2024-0301, CL-2024-0302, and CL-2024-0303

MOORE, Presiding Judge.

D.M. ("the mother") appeals from judgments entered by the Dale Juvenile Court ("the juvenile court") terminating her parental rights to N.K.M. and N.S.M. ("the children"). D.D. ("the father") appeals from the judgment of the juvenile court terminating his parental rights to N.S.M. For the reasons discussed herein, we reverse the judgments and remand the cases.

Procedural Background

On October 30, 2023, the Dale County Department of Human Resources ("DHR") filed petitions to terminate the parental rights of the mother to N.K.M. and to terminate the parental rights of the mother and the father N.S.M.[1] The juvenile court conducted a trial on the petitions on April 11, 2024. On April 16, 2024, the juvenile court entered judgments terminating the mother's parental rights to N.K.M. and N.S.M. and the father's parental rights to N.S.M. The mother and the father timely appealed the judgments.

---

[1]DHR also petitioned to terminate the parental rights of M.H. to N.K.M. M.H. consented to entry of a judgment terminating his parental rights, and he has not appealed.

<u>Issues</u>

The mother and the father both argue that the judgments terminating their parental rights are not supported by sufficient evidence of grounds for termination or of the lack of viable alternatives. They also assert that the juvenile court did not receive sufficient evidence indicating that the termination of parental rights would serve the best interests of the children. We find the last issue dispositive of these appeals.

<u>Standard of Review</u>

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" <u>C.O. v. Jefferson Cnty. Dep't of Hum. Res.</u>, 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting <u>L.M. v. D.D.F.</u>, 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is

> evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved.'

"KGS Steel, [Inc. v. McInish,] 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].

"... [F]or trial courts ruling ... in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion. [Ala. Code 1975,] § 25-5-81(c)."

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

4

The Evidence

When the mother was 18 or 19 years old, she engaged in a sexual relationship with the father, who, at that time, was in his late 30's and living in Pensacola, Florida. N.S.M. was born of that relationship on September 27, 2016; however, the mother informed the father that another man was the biological father of N.S.M. The father would occasionally care for N.S.M., but only as a friend of the mother's and not as the father of the child.

The mother moved to Dale County at some point and began a sexual relationship with M.H.; that relationship led to the conception and birth of N.K.M. on June 6, 2019. Thereafter, the mother and the children resided together. In March 2020, DHR implemented a safety plan for the children arising from concerns that the mother was abusing marijuana and exposing the children to that drug. The mother violated the safety plan by leaving Dale County to live with the children in Pensacola with her family. In November 2020, she returned to Dale County with the children and a paramour. When the paramour attempted to cash a stolen check, local police notified DHR, and DHR picked up the children and placed them in foster care. Drug tests from November 25, 2020, showed that the mother was positive for marijuana and methamphetamine and

that the children were also positive for methamphetamine. The mother was "indicated," see Ala. Code 1975, § 26-14-8(a)(1) (defining "indicated"), for child abuse and neglect.

The mother did not regularly submit to drug screens, but she did submit to one drug screen in 2021, which was negative; DHR questioned whether the urine tested in that drug screen was the mother's and whether the results were valid. DHR requested that the mother provide it with "full information" regarding that 2021 drug screen but the mother did not provide DHR with that information. The DHR representative testified that the one questionable negative drug screen in 2021 was not sufficient to show that the mother was not abusing drugs and could safely parent the children. She testified that, in her opinion, the mother had not changed her behavior in any demonstrable way to become fit to properly parent the children.

The mother moved to Pensacola at some point in 2022, preventing her from receiving full services from DHR. The mother has transportation issues, so she does not travel to attend visits with the children or to attend individualized-service-plan ("ISP") meetings. At the time of the trial, the mother had visited with the children in person on only two occasions since 2021, but she had talked to them regularly, every

other week, using the videoconferencing application Zoom. The mother had attended the ISP meetings by telephone. DHR had provided transportation services to assist the parents with attending in-person visits, but the mother did not take advantage of those services. The mother did not attend the trial.

After the mother informed the father that he was probably the biological father of N.S.M., the father submitted to genetic testing in 2022; that testing confirmed his paternity. A child-support proceeding ensued, and the father was adjudicated to be the legal father of N.S.M. The father pays regular child support for N.S.M. through an income-withholding order. He works as a painting foreman.

The father testified that he wanted a father-child relationship with N.S.M., but he admitted that he had not informed N.S.M. of their biological relationship, had not visited with N.S.M., and had not sent her any birthday or Christmas gifts since he had learned of his paternity. DHR arranged for visits, but the father did not attend them. In February 2024, DHR provided the father with a "Zoom link" so that he could visit with N.S.M. remotely; although the father claimed that he had not understood how to access the link, the father had not made any inquiries to DHR to clear up his confusion. The father offered vague and

unsatisfactory explanations for why he had not exerted any real effort to form a paternal relationship with N.S.M. since she has been in foster care, repeatedly asserting that he simply had not known what to do and had not wanted to overstep his bounds.

The father tested positive for marijuana, cocaine, and alcohol on the date of the trial. The father admitted to regular recreational drug use, but he denied that it had impaired his ability to parent his two teenage children, with whom he shared a residence. A post on the social-media platform Facebook post by one of those teenagers indicated that that teenager may be using drugs. The father denied any knowledge of the post and stated that he did not want to invade the privacy of his teenagers by prying into their social-media accounts. The father has an extensive criminal history, including a conviction for lewd and lascivious conduct with a minor female for which he was a registered sex offender. The father, who was 45 years old at the time of the trial, spent a lot of his social time skateboarding and hanging around a younger, drug-fueled crowd.

At the time of the trial, the children had been residing together with their foster mother for three years. The foster mother testified that N.K.M. has asthma and autism, which, she said, affects his behavior and

his speech and that N.S.M. had recently been diagnosed with anxiety. N.K.M. was enrolled in a pre-kindergarten program for children with special needs that was working toward improving his speech and social and emotional skills. N.S.M. was enrolled in first grade, and the school was contacting the foster mother every day to pick N.S.M. up from school due to her anxiety. The foster mother testified that the children should stay together because N.K.M. thrives when he is with N.S.M.

Analysis

Section 12-15-319(a), Ala. Code 1975, a part of the Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-101 et seq., provides that a juvenile court "may" terminate parental rights if clear and convincing evidence proves that the parents "are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." Furthermore, when exercising its discretion in deciding whether to terminate parental rights, "the court shall consider the best interests of the child." Id. Accordingly, a juvenile court must make "a separate determination that termination of parental rights serves the best interests of the child, and, if it does not, it may not

terminate parental rights." J.A. v. S.L., [Ms. CL-2023-0576, June 28, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024).

In this case, the juvenile court found that the children had bonded with their foster mother, who had cared for them the previous three years, and that it would be contrary to their best interests to be separated from her and from each other. The juvenile court further found that it would be in the best interests of the children to terminate the parental rights of the mother and the father so that the children could be freed for adoption. The mother and the father argue, however, that the juvenile court did not receive sufficient evidence to sustain the latter finding. They point out that the foster mother did not testify that she intended to adopt the children, and DHR did not present any evidence identifying any other adoptive resource or tending to prove that the children would likely be adopted.

In J.A., supra, this court explained that, before terminating parental rights, a juvenile court should consider whether the termination of parental rights will likely afford the children permanency through adoption. This court said:

> "The best-interests-of-the-child inquiry focuses exclusively on the impact of the termination on the needs and interests of the child. In considering the best interests of the child, a

juvenile court is determining not whether it <u>can</u> terminate parental rights, but whether it <u>should</u> terminate parental rights for the benefit of the child for whom the remedy is intended. <u>See</u> <u>S.D.P. v. U.R.S.</u>, 18 So. 3d 936, 942 (Ala. Civ. App. 2009) (Moore, J., concurring specially).

"In examining whether termination of parental rights promotes the best interests of the child, a juvenile court should consider all the traditional best-interests factors, <u>see</u> <u>Ex parte Devine</u>, 398 So. 2d 686, 696 (Ala. 1981) (holding that, in deciding what is in the best interests of the child, the fact-finder should consider, among other things, the emotional, social, moral, material, and educational needs of the child), but the court should primarily focus on the effect of the proposed termination on the child's needs for security, stability, and permanency. <u>See</u> <u>S.D.P.</u>, 18 So. 3d at 944 (Moore, J., concurring specially). By allowing a juvenile court to involuntarily sever the rights of a parent so that the child can be adopted without the consent of that parent, termination of parental rights is a remedy that is specially designed to meet the particularized needs of a child for a stable and permanent custodial arrangement. <u>See</u> <u>T.W. v. Calhoun Cnty. Dep't of Hum. Res.</u>, [[Ms. CL-2022-0694, June 2, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023)]. Thus, at a minimum, when deciding whether termination of parental rights is in the best interests of a child, a juvenile court should focus on whether termination of the legal relationship between the child and the parent will protect the welfare of the child and promote the stability and permanency of the child. <u>Id.</u>"

___ So. 3d at ___.

The record in this case is very similar to the record in <u>T.W. v. Calhoun County Department of Human Resources</u>, [Ms. CL-2022-0694, June 2, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023), in which the Calhoun

Juvenile Court terminated the parental rights of a parent to two children with special health and educational needs. The evidence showed that the two siblings were residing together in a foster home with a foster parent who would not agree to adopt them. The Calhoun County Department of Human Resources had implemented a permanency plan calling for the adoption of the two siblings, but no adoptive resource had been identified. The agency presented no evidence as to the likelihood that the two siblings would be adopted following termination of their parental rights or to the methodology it would follow to assure their adoption. In reversing the judgment, this court said:

> "This court has repeatedly emphasized that, before proceeding to terminate the parental rights of the parents of special-needs children, a juvenile court must consider whether the children will likely achieve permanency through adoption. ... In order for the juvenile court to consider that factor, it was incumbent upon DHR to present clear and convincing evidence of the viability of adoption so that the juvenile court could make an informed evaluation and decision .... However, DHR did not even attempt to introduce any evidence on that point."

___ So. 3d at ___.

In this case, the record contains no evidence indicating that the children, whose special needs impede their adoption prospects, see Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06 (defining a "special needs child," for the purpose of subsidized adoption, as, among other

things, a child who is over five years of age; or who is in a group of two or more siblings seeking joint adoption; or who has a physical disability; or who is receiving ongoing medical treatment for an emotional or behavioral issue), were adoptable, as a unit or otherwise. See 42 U.S.C. § 671(a)(31)(A) (provision of federal law requiring states to develop a plan to use reasonable efforts to place siblings together in the same adoptive home). From the record, the juvenile court could not have reasonably determined that adoption was a likely outcome for the children or that their permanency interests would be advanced by termination of the mother's and the father's parental rights. The judgments only leave legal custody of the children with DHR with a right and duty to use reasonable efforts to place the children for adoption, an outcome that remains strictly speculative.

Unlike in T.W., in these cases, the juvenile court determined that the mother had abandoned the children and that the father had abandoned N.S.M. If so, the juvenile court properly found grounds for termination, and it did not have to exhaust viable alternatives before terminating the parents' parental rights. See C.C. v. L.J., 176 So. 3d 208 (Ala. Civ. App. 2015). However, the juvenile court still had to determine from the evidence that termination of parental rights would serve the

best interests of the children by likely providing them permanency through adoption as a separate essential element.  See J.A., supra.  The juvenile court did not receive any evidence on this crucial point, so its judgments must be reversed.

Conclusion

Based on the record before us, the juvenile court could not have been clearly convinced that the termination of the parental rights of the mother and the father would serve the best interests of the children.  Thus, we conclude that the juvenile court erred in terminating the parental rights of the mother and the father.  We, therefore, reverse the judgments and remand the cases for further proceedings consistent with this opinion.

CL-2024-0301 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2024-0302 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2024-0303 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

Edwards, Hanson, Fridy, and Lewis, JJ., concur.