Rel: April 14, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

## CL-2022-0710

_____

## W.W.

## v.

## H.W.

## Appeal from Morgan Juvenile Court
## (JU-21-823.01)

THOMPSON, Presiding Judge.

On November 1, 2021, H.W. ("the mother") filed in the Morgan Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of W.W. ("the father") to the minor child born of their marriage. The juvenile court conducted a hearing on May 16, 2022, at

which it received ore tenus evidence. On that same day, the juvenile court entered a judgment granting the mother's petition and terminating the father's parental rights. In its judgment, the juvenile court found, in part, that the father had abandoned the child. The father filed a timely notice of appeal to this court.

The record does not indicate when the parties married, but, on September 2, 2020, the Cullman Circuit Court conducted a pendente lite hearing in a divorce action involving the parties. During that pendente lite hearing, the parties reached a settlement agreement concerning their competing claims in the divorce action. The Cullman Circuit Court entered a judgment on October 7, 2020, that divorced the parties and incorporated the terms of the parties' settlement agreement. Pursuant to that divorce judgment, the mother was awarded sole custody of the child, and the father was awarded supervised, alternating-weekend visitation with the child for a period of six months. The divorce judgment required the father to attend a substance-abuse assessment and to submit to random drug screens during that six-month period. According to the provisions of the divorce judgment, after the father had completed the substance-abuse assessment and six months of drug screens, the parties

were to file a joint motion in the Cullman Circuit Court so that the father could receive a standard schedule of unsupervised visitation with the child. The divorce judgment further required that the wife transport the child to the alternating-weekend visitations with the father and that the father pay the mother $64.80 for doing so; the father explained that that amount was to compensate the mother for gasoline for her vehicle.

The divorce judgment also awarded the father telephone visitation with the child on Mondays, Thursdays, and Fridays between 5:00 p.m. and 7:00 p.m., and it provided that the mother could contact the child by telephone on Saturdays when the child was visiting the father. Pursuant to the terms of the divorce judgment, the party who intended to contact the child during the times specified in that judgment was to "text the other party simply stating that [he or she is] about to contact the child. If the minor child is not available at that time, the minor child shall return the contact that same day."

In addition, the divorce judgment required that the father pay the mother $526.13 per month in child support, and it ordered that an income-withholding order ("IWO") be entered within 14 days of the entry of that judgment. The divorce judgment specified that, until the father's

3

child-support obligation could be paid through the IWO, the father was to pay his monthly child-support obligation directly to the mother.

On August 18, 2020, while the divorce action was pending, the Cullman Circuit Court entered a pendente lite protection-from-abuse ("PFA") order against the father. The mother testified that she had requested the entry of the PFA order because the father had been constantly harassing her, had yelled and cursed at her, and had threatened to kill her. The divorce judgment specified that the PFA order was to "remain in full force and effect except for any provisions that would conflict with the [father's] rights to visitation and communication with the child as set out herein."

The mother testified that in accordance with the settlement agreement that was later incorporated into the divorce judgment, the father was to complete a substance-abuse evaluation on September 9, 2020. However, the mother testified, she did not know whether the father had attended that evaluation. The mother stated that she had received two photographs from the father via text messaging that showed the results of two drug screens that the father had taken some time after October 2020; the father did not send the mother any text message

explaining those photographs. The mother stated, however, that the father had "also sent me pictures before the divorce that he had found online" and that, after the divorce, he had sent her text messages saying he had mailed child-support payments but that she had never received any of those payments. The mother stated that, based on those facts, it was difficult for her "to know when things are true and when they are not." Regardless, the mother said, the father did not notify her that he had completed the requirement that he submit to drug screens for six months.

The mother explained that the father "is not allowed" to drive with the child in a vehicle because he had "been caught" driving while under the influence of alcohol and, at the time the parties reached their settlement agreement, he had been unable to provide proof that he had a driver's license or vehicle insurance. For that reason, the mother said, the settlement agreement had provided that the mother transport the child to any visitations with the father. The mother also testified that, before the parties entered into the settlement agreement in September 2020, the father had not exercised visitation with the child for almost one year.

5

The mother and the father agreed that the father had exercised his supervised alternating-weekend visitation, as outlined in the settlement agreement, only twice. The first supervised weekend visitation between the father and the child occurred on September 6, 2020, through September 8, 2020, which was the weekend following the execution of the settlement agreement. The mother stated that the father next exercised his supervised weekend visitation with the child on October 2, 2020, through October 4, 2020. Those two weekend visitations were supervised by the father's mother, S.N. ("the paternal grandmother").

The mother testified that during the father's October 2020 visitation with the child, the child had used a social-media video-conferencing platform to contact her. The mother stated that the child was crying during that contact, and, the mother said, she could see and hear the father and his girlfriend "fighting" in the background behind the child. The mother admitted that she had contacted law enforcement and had asked them to check on the situation. Law-enforcement officers traveled to the home (it is not clear whether it was the father's home or the paternal grandmother's home), but no arrests were made.

In his testimony, the father denied that he and his girlfriend were fighting or that he had frightened the child during the visitation in October 2020. The father admitted that the child had been crying when the child had contacted the mother. However, the father said that the child had been crying because the child missed the mother.

The mother testified that, after the October 2020 visitation, the father did not again ask for or attempt to arrange any further supervised weekend visitations. However, she said, on several occasions, the father requested that he be allowed to visit the child on dates that were outside the schedule of visitation set forth in the divorce judgment. The mother explained that the father would call on a weekday and ask to see the child. The mother stated that she had generally denied the father any visitation other than that set forth in the divorce judgment but that she had transported the child for two meetings with the father in mid-2021. The mother stated that on May 4, 2021, at the father's request, she and the child met the father at a fast-food restaurant for approximately 30 minutes; the mother explained that that meeting had lasted only 30 minutes because the parties became concerned about tornado warnings and agreed to end the meeting early. The mother testified that she

7

transported the child to a meeting with the father at a Mexican restaurant on June 7, 2021, but, she said, she decided to leave with the child within 30 minutes because the father "was [lying] down in the booth at [the] Mexican restaurant while we were trying to eat." The mother also stated that, in March 2021, she sent the father the schedule for the child's extracurricular softball season, but, she said, the father had not attended any of the child's softball practices or games.

According to the mother, after the divorce, she initially allowed the father to speak with the child if the child was not asleep or the mother was not at work. However, she testified that after the parties reached the settlement agreement and after the divorce judgment had been entered, the father continued to harass her, and, she said, he had again threatened her life. The mother elaborated that, as a part of his harassment, the father had sometimes called her as frequently as 30 times in one hour. The mother testified that although the divorce judgment specified that the father could call the child three times a week between 5:00 p.m. and 7:00 p.m., his harassing communications occurred outside those times.

The mother testified that because of the father's continued inappropriate contacts, she and the child, on June 13, 2021, moved from their former residence to a new home, and the mother did not provide the father with the address of the new home. In addition, at that time, the mother "blocked" the father from contacting her on her cellular telephone. The mother stated that the father had claimed to be living with the paternal grandmother at the time she blocked him on her cellular telephone and relocated without informing him of her new address. The mother explained that she had informed the father that he could reach her through the paternal grandmother, with whom the mother had a good relationship. The mother had not prevented the paternal grandmother from contacting her by telephone or text message, and the mother had informed the paternal grandmother of her new address. She also stated, as is explained, infra, that she communicated frequently with the paternal grandmother. The mother testified that the purpose of making the father contact her solely through, and in the presence of, the paternal grandmother, was to prevent the father from yelling and cursing at her or threatening her. The mother admitted that she had never contacted law enforcement concerning the father's

harassment and that she had not sought to enforce that part of the divorce judgment that incorporated the PFA order.

The father submitted into evidence an exhibit comprising printed copies of some communications between the mother and the paternal grandmother over a social-media platform's messaging feature; those messages occurred between September 14, 2021, and sometime in April 2022. That exhibit does not set forth a full recitation of all the conversations between the mother and the paternal grandmother through that messaging feature, as breaks in conversation between the pages of the exhibit demonstrate that some comments between the mother and the paternal grandmother are missing from that exhibit. Also, the mother testified that she and the paternal grandmother had often communicated via text messaging, and the record contains no evidence concerning those communications.

The exhibit setting forth some of the communications between the mother and the paternal grandmother indicates that the paternal grandmother often mentioned "we" when she requested to visit or contact the child; for example, she often requested that "we" be allowed to communicate with the child through a telephone's video-conferencing

feature. The mother insisted that when the paternal grandmother said "we" in those messages, the paternal grandmother was referring to herself and her husband and not to herself and the father. For example, the paternal grandmother asked several times if "we" could contact the child via the video-conferencing feature, or if "we" could visit the child, and those contacts and visits took place between the paternal grandmother, the paternal grandmother's husband, and the child; the father was not present.

The mother stated that the paternal grandmother had requested only three times that the father be allowed to contact or visit the child. On the first occasion, the paternal grandmother mentioned the father's first name in her communication and stated that the father wanted to speak with the child at 10:03 p.m. on the night after Christmas; that message is reflected in the exhibit that the father submitted into evidence. The mother stated that she had not allowed the father to speak with the child that night because it was late and the child did not want to speak to the father. In the second request, the paternal grandmother, on behalf of the father, asked that the father be allowed to contact the

11

child via a video-conference platform on the father's birthday, and, the mother testified, that contact had occurred.

The mother stated that the paternal grandmother's last request made on behalf of the father occurred immediately following a court hearing shortly before the termination-of-parental-rights hearing. The record indicates that a court hearing had been held on February 23, 2022, and that, immediately following that hearing, the juvenile court entered an order at 9:24 a.m., in which it scheduled the termination-of-parental-rights hearing. The mother testified, and the exhibit shows, that at 3:43 p.m. that same day, the paternal grandmother asked, on behalf of the father, if the mother and the child could meet the father for dinner in Huntsville that night. The mother responded to that request by stating that she and the child already had plans that night and that "we're not meeting him unless it is supervised and waiting until after [the scheduled] court hearing will be the best thing. It's been almost a year since he has attempted to even see [the child], so one more month shouldn't be a problem." We note that at the termination-of-parental-rights hearing, the mother testified that Huntsville, which is where the father wanted to meet, is an hour's drive from her home.

The mother stated that the child had occasionally communicated with the father over an educational electronic tablet that the child had owned since she was two or three years old. According to the mother, that electronic tablet broke in May 2022, and she had not replaced it.

The mother stated that since the divorce, the father had had multiple jobs, which had prevented the parties from obtaining an IWO to satisfy the father's child-support obligation. It is undisputed that the father had not paid any child support before the divorce judgment was entered or after the entry of the divorce judgment. According to the mother, the father owed approximately $10,000, plus interest, in past-due child support. The mother also testified that the father had not sent the child any birthday or Christmas presents.

The mother testified that in early 2022 the child's pediatrician had recommended that the child begin attending counseling because the child was experiencing trauma and/or separation anxiety as a result of the divorce and the father's absence. According to the mother, the child began attending counseling approximately three months before the termination-of-parental-rights hearing. No evidence concerning the

13

substance of the child's counseling sessions was presented at the termination-of-parental-rights hearing.

The mother stated that she did not believe that the father could or would discharge his parental responsibilities to the child. The mother stated that she believed that the father's parental rights should be terminated. However, she stated that she had no intention of interfering with the relationship and contact between the paternal grandmother and the child.

In his testimony, the father stated that he had complied with the terms of the divorce judgment. The father stated that he submitted to a substance-abuse evaluation in Autauga County and that he had completed drug screens through a court-referral program in Autauga County. The father admitted that the results of his first two drug screens, taken in September 2020 and October 2020, were positive for marijuana. The father submitted into evidence an exhibit showing that he had had a negative drug-screen result through the court referral program on November 24, 2020, January 19, 2021, February 11, 2021, and March 10, 2021. The father also presented evidence that he had had negative drug-

screen results from drug screens required by an employer that he had completed on May 3, 2021, on February 23, 2022, and on April 11, 2022.

According to the father, he had lived with two different girlfriends and with his mother since the divorce judgment was entered. The father stated that he had requested his supervised weekend visitation from the mother in November 2020 and December 2020 but that the mother had refused that visitation because she did not want the father's girlfriend to be around the child. The father said that the mother had made excuses to deny him visitation with the child between the October 2020 visit and December 2020. The father stated that he had stopped sending the mother evidence of his drug-screen results because, he said, he "never got visitation" with the child. The father admitted that he had not filed anything in the Cullman Circuit Court seeking to enforce his visitation rights with the child.

The father testified that he had had six different employers since September 2020. The father admitted that he had not paid child support for the child since the divorce judgment. He stated that he had offered to pay child support directly to the mother, but, he said, the mother had insisted on "going through the courts," apparently meaning that she

15

wanted to receive payments through an IWO. It is undisputed that no IWO was ever entered in the divorce action. Later in his testimony, when asked why he had failed to contribute to the child's support, the father claimed that he had not known where to send a child-support payment or to whom to give a child-support payment.

The father stated that he had changed jobs a few weeks before the termination-of-parental-rights hearing and that he earned $20 per hour from his new employer. The father testified that, after he received his first paycheck from his new employer, he had given a $700 money order for child support to his court-appointed attorney. The record does not indicate whether that payment was given to the mother.

According to the father, after June 2021, he had asked the paternal grandmother to contact the mother regarding his visitation, and that, as far as he knew, the paternal grandmother had done so. The father insisted that when the paternal grandmother had communicated with the mother to request that "we" be allowed to contact or visit the child, the paternal grandmother was contacting the mother on behalf of the father and not referring to her own husband. The juvenile court interrupted that line of questioning to verify that the father was saying

16

that, when the paternal grandmother said "we," she was referring to herself and the father. The father responded to the juvenile court's questioning by saying "not every time," and he admitted that some of those requests set forth in the exhibit were for the paternal grandmother and her husband to be able to contact or visit with the child.

The father stated that he had maintained some contact with the child by messaging her on her electronic tablet. He stated that he frequently attempted to contact the child through that tablet, but, he stated, the child only occasionally answered him. That testimony seems consistent with the mother's testimony that the child rarely used the tablet, presumably because she was outgrowing the programs on that tablet. Regardless, the father stated that he last communicated with the child over that tablet in November 2021 when the child contacted him to tell him about a camping trip that she was having with the mother and friends. The father accused the mother of taking the tablet away from the child after that communication was discovered.

The father denied that he had ever threatened to kill the mother. Instead, according to the father, he "may have said something out of the way," but he could not recall what that statement might have been. The

father explained that on one occasion, he had been upset because he learned after the fact that the child had been at a hospital being tested for the COVID-19 virus. The child has a seizure disorder, and the father stated that he had been concerned that the symptoms the child was experiencing might have triggered a seizure.

When a custodial parent brings an action to terminate the other parent's parental rights, the court must apply a two-prong test in determining whether to terminate those rights.

> "First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § [12-15-319, Ala. Code 1975]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered."

Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990).

In its judgment, the juvenile court found that the father had abandoned the child by failing to visit the child, by failing to maintain consistent contact with the child, and by failing to financially support the child. The father contends that the juvenile court erred in determining that he had abandoned the child. "Abandonment" is defined as:

> "[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without

18

> good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

§ 12-15-301(1), Ala. Code 1975.

In his appellate brief, the father sets forth reasons attempting to explain why he failed to communicate with or visit the child <u>after</u> the mother blocked his contact with her. The father does not address his failure to communicate with or visit the child both before the entry of the divorce judgment and his minimal visitation with the child through June 2021. Regardless, the juvenile court found the mother's testimony regarding the father's conduct to be more credible than that of the father.

The evidence supports a conclusion that the father withheld his presence, care, love, and support from the child without a good cause or excuse and that he failed to claim or perform the duties of a parent. The juvenile court found that the father had failed to visit the child for approximately one year before the divorce judgment had been entered and that his conduct before the mother blocked his telephone contact with the child also constituted an abandonment of the child. As the juvenile court noted, the father could have sought to enforce his visitation rights with the child, but he did not do so. Alternatively, the father could have

requested his supervised weekend visitation through the paternal grandmother. We agree with the juvenile court that, given the totality of the father's conduct, together with his refusal to contribute to the child's support, the evidence supports a finding that the father had abandoned the child.

The father also contends that the juvenile court failed to consider whether there were alternatives to the termination of his parental rights. "'By abandoning [his] child, [the father] "lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating [his] parental rights."'" T.T. v. C.E., 204 So. 3d 436, 439 (Ala. Civ. App. 2016) (quoting L.L. v. J.W., 195 So. 3d 269, 274 (Ala. Civ. App. 2015), quoting in turn C.C. v. L.J., 176 So. 3d 208, 217 (Ala. Civ. App. 2015)). However, the juvenile court was still required to consider whether the termination of the father's parental rights would serve the child's best interest.

> "'[W]hen one parent seeks to terminate the other parent's parental rights, a "finding of dependency" is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that termination is in the child's best interest, in light of the surrounding circumstances.'"

20

Ex parte L.J., 176 So. 3d 186, 189-90 (Ala. 2014) (quoting Ex parte Beasley, 564 So. 2d at 954). It is well settled that the paramount concern in a termination-of-parental-rights action is the best interest of the child. C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 987 (Ala. Civ. App. 2008); R.S. v. R.G., 995 So. 2d 893, 903 (Ala. Civ. App. 2008); A.J.H.T. v. K.O.H., 983 So. 2d 394, 399 (Ala. Civ. App. 2007).

In this case, the mother testified that the child had been seeing a counselor for three months before the termination-of-parental-rights hearing; the mother claimed that the reason counseling was necessary, at least in part, was because the child had separation anxiety. The mother presented no evidence regarding whether the father's abandonment of the child had caused the child mental distress or whether the counseling was meant to address issues pertaining to a possible desire of the child to maintain a relationship with the father. Neither party presented evidence concerning the nature of the relationship between the father and the child or how the father's intermittent contact with, and abandonment of, the child had impacted the child.

Further, the termination of the father's parental rights would leave the child in this case without a legal father. Although the mother testified that she was engaged to be married, there is no evidence in the record indicating that that man might adopt the child in the future.

The holding in this opinion is not meant to condone the behavior of the father. However, although the juvenile court found that the termination of the father's parental rights would serve the child's best interest, this court can find no evidence in the record to support that finding. See, e.g., D.S.R. v. Lee Cnty. Dep't of Hum. Res., 348 So. 3d 1104, 1112 (Ala. Civ. App. 2021). Accordingly, in the absence of evidence on the issue of the child's best interest, we reverse the juvenile court's judgment terminating the father's parental rights.

REVERSED AND REMANDED.

Edwards, Hanson, and Fridy, JJ., concur.

Moore, J., concurs in the result, with opinion.

MOORE, Judge, concurring in the result.

I concur in the result in the main opinion based on the authority of J.C.D. v. Lauderdale County Department of Human Resources, 180 So. 3d 900, 901 (Ala. Civ. App. 2015), and based on my opinion concurring in the result in S.D.P. v. U.R.S., 18 So. 3d 936, 941-45 (Ala. Civ. App. 2009) (Moore, J., concurring in the result).