Rel: December 13, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2024-0273

_____

## Fernando Morgan, as guardian ad litem for K.J.W.

### v.

## T.R.W.

### Appeal from Montgomery Juvenile Court
### (JU-08-93.06)

EDWARDS, Judge.

In September 2021, the Montgomery County Department of Human Resources ("DHR") filed in the Montgomery Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of L.J.M. ("the mother") and T.W. ("the father") to K.J.W. ("the child"). In its petition,

DHR specifically alleged that the mother and the father had abandoned the child for a period exceeding four months before the filing of the petition and relied on the presumption supplied by application of Ala. Code 1975, § 12-15-319(d), that the mother and the father were therefore "unable or unwilling to act as parents." After several continuances, the juvenile court held a trial on the termination of the mother's parental rights in November 2023. The mother consented to the termination of her parental rights, and the juvenile court entered a judgment terminating her parental rights on November 28, 2023. In that judgment, apparently because the father appeared at the trial after the child had contacted him through social media, the juvenile court "bifurcated" the trial on the termination of the father's parental rights to permit DHR to engage in reunification efforts for the father and to consider potential relative resources.

The trial on the termination of the father's parental rights occurred on March 13, 2024. The father did not attend the trial. The juvenile court entered a judgment on April 14, 2024, denying DHR's petition to terminate the father's parental rights. In that judgment, the juvenile

court concluded that DHR had failed to make any efforts to rehabilitate the father during the period between the November 2023 trial and the March 2024 trial. Although the juvenile court stated that "th[e] father may have failed to claim the rights of a parent, or to perform the duties of a parent," the juvenile court appeared to blame DHR for failing to locate the father earlier. Ultimately, the juvenile court concluded that DHR had not met its burden of proving abandonment of the child by the father. The child's guardian ad litem, Fernando Morgan, has appealed the judgment on behalf of the child.

The termination of parental rights is governed by Ala. Code 1975, § 12-15-319. That statute reads, in pertinent part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall

3

consider the following factors including, but not limited to, the following:

"(1) That the parent[] [has] abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parent[].

"....

"....

"(d) A rebuttable presumption that the parent[] [is] unable or unwilling to act as [a] parent[] exists in any case where the parent[] ha[s] abandoned a child and this abandonment continues for a period of four months next preceding the filing of the petition. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."

The term "abandonment" is defined in Ala. Code 1975, § 12-15-301(1), as

"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and

4

convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), "[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

> "'must ... look through ["the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'"

5

K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c)).

The evidence before the juvenile court consisted of certain documentary evidence, including the child's birth certificate, a judgment adjudicating the father's paternity, and a record of the father's 2011 conviction for shooting into an occupied vehicle. The juvenile court also heard the testimony of Nijah Cheatham, the DHR caseworker currently assigned to the child's case; Cynthia Foote, the current DHR program supervisor; and the child. As previously noted, the father did not attend the trial.

Cheatham testified that she had been the child's caseworker for approximately two months. Although she indicated familiarity with the case file, she often indicated when testifying that she was uncertain or unsure of certain facts and dates preexisting her brief tenure. She testified that DHR had not offered the father any services because, she said, she understood that DHR had not been able to establish contact with the father. Cheatham reported that DHR had attempted to contact the father in the past through the use of mail sent to his last known

address.  She said that DHR personnel had not had any contact with the father since the November 2023 trial.  She also indicated that she did not have a telephone number for the father.

Cheatham admitted that she was aware that the child had had some contact with the father through text messages and/or a cellular telephone.  However, it was not entirely clear when Cheatham learned of the child's contact with the father.  She also admitted that she did not know if the previous caseworker had established contact with the father or whether the previous caseworker had provided the father with contact information for DHR at the November 2023 trial.  She did clearly state, however, that the father had not "come forward attempting to be involved in any services."

Regarding the child's prospects for adoption, Cheatham testified that she was aware of a person named "S.L." who was a potential adoptive resource.  Cheatham indicated that S.L. was interested in pursuing adoption of the child; she testified that S.L. had requested "to start doing the overnight visits on the weekend."  She also said that the child had requested that she reach out to a "Ms. H." but that she had not

7

yet done so. According to Cheatham, the State Department of Human Resources also had been looking at one potential adoptive placement for the child but that "[the child] was not sure" about that potential placement.[1]

Foote testified that she had previously been the DHR supervisor assigned to the child's case but that she had since become the DHR program supervisor. She testified that DHR had not had any contact with the father before his appearance at the November 2023 trial, which occurred shortly after the child had made contact with him. She also said that DHR had not had any contact with the father after the November 2023 trial.

According to Foote, she was not aware of any contact that the child had had with the father before November 2023. She stated that, as far as she knew, the child's contact with the father had begun only recently. More specifically, she said that, to her knowledge, the child had had no previous contact with the father between her entry into DHR's custody

_____

[1]Because the child was over the age of 14 at the time of the March 2024 trial, her consent to the adoption is required. Ala. Code 1975, § 26-10E-7(a)(1).

in 2018 and the November 2023 trial. She also said that the father had abandoned the child by his previous conduct and that his abandonment had exceeded a period of four months.

When questioned about DHR's procedure for identifying adoptive resources, Foote testified that, once termination of parental rights occurs, a child is placed on "the Heart Gallery website" so that prospective adoptive parents can apply to adopt that child. She said that, before termination of parental rights occurs, DHR may attempt what she described as "a legal-risk placement," which allows a child to be placed in a prospective adoptive home pending termination of parental rights. She said that DHR had attempted to find a legal-risk placement for the child.

Foote indicated that the child had provided the names of persons that she thought might be interested in adopting her. According to Foote, one of those persons, a Ms. H., was a former foster parent of the child. Foote said that Ms. H. was elderly and that she would not be able to adopt the child. However, Foote said that, although she did not recall the specific names, two persons had been listed on the most recent individualized-service plan so, she said, they would be explored. When

9

asked if she knew who "S.L." was, Foote answered that she did not. Foote also indicated that DHR had previously located two prospective adoptive families, that the child had visited with both of those families, but that the child had not been interested in pursuing placement with one of the families. Foote did not clearly indicate what occurred with the other family.

The child testified that she had only recently had contact with the father and that she had not recalled having ever met the father before November 2023. She admitted that she might have met him when she was very young. The child testified that she had seen her father only twice that she recalled: at a funeral and at the trial, which were both in November 2023. She said that she had located the father through the paternal grandmother, R.M., who, she said, she had located on a social-media website. She described the father as being shocked when she contacted him and said that she had been surprised that he had responded to her.

The child testified that she had spoken with the father the day before the termination-of-parental-rights trial because she had felt bad

for not answering his text messages and/or telephone calls. She testified that he had telephoned her the day before the trial and that, when she had not answered, he had texted her to ask if she had blocked his number. She said that she had responded to his text message by saying, "no," and that she had returned his telephone call after her soccer game that evening. Although she indicated that she had been happy when the father had initially answered her in November 2023, when asked if she desired to continue contact with the father, she answered: "Not really." When asked if she would desire to maintain a relationship with the father after she is adopted, she also answered in the negative, stating: "I would like to move past all of that."

According to the child, the father had told her that he did not have the means to provide for her. She said that he had told her that he did not have his own residence or an automobile; she also testified that she thought that he lived with friends because he had told her that he "did not have a place right now." When asked if the father had employment, the child testified: "Not that I know of." She said that she had not asked him about his employment.

11

The child testified that she desired to be adopted. She explained that she knew two potential adoptive resources, S.L. and Y.O. She said that both women had been visiting her for about one year and that both had taken an interest in her. She said that S.L. had spent time with her, had come to her soccer games, and had spoken to her every day. She also said that, "if I ever need anything, like, you know, like soccer or school or anything, prayer or anybody to talk to, [S.L. and her family] are the people that I can call." The child also testified that S.L. had completed foster-care classes and that she had been to S.L.'s home for a visit.

As Morgan argues, the evidence presented at the trial established that, in the four months preceding the filing of the petition, the father had had no contact with the child, who had been in the custody of DHR since approximately May 2018, and that he had not provided any support of any kind for the child. The child testified that her first memory of ever meeting the father was in November 2023, when she met him in person on two occasions, after she took steps to locate her paternal relatives through the use of social media. Similarly, Foote testified that, as far as she was aware, the father had not had contact with the child or with DHR

12

before November 2023. The juvenile court even found that "the ... child has resided in foster placement for many years, with little to no contact with the father." The juvenile court therefore erred in concluding that DHR failed to prove that the father had abandoned the child in the four-month period preceding the filing of the termination-of-parental-rights petition. Accordingly, by operation of Ala. Code 1975, § 12-15-319(d), "a rebuttable presumption that the [father] [is] unable or unwilling to act as [a] parent[]" arose.

As we explained in C.F. v. State Department of Human Resources, 218 So. 3d 1246, 1251 (Ala. Civ. App. 2016),

> "[b]ased on [former Ala. Code 1975,] § 12-15-319(b)[, the predecessor statute to § 12-15-319(d)], once DHR proved that the [parent] had abandoned the child in the four months before it filed its petition, the juvenile court could presume that the [parent] was unable or unwilling to act as a parent, and the burden shifted to the [parent] to rebut that presumption."

That is, once the rebuttable presumption under § 12-15-319(d) arose, "the father had the opportunity to present evidence rebutting the presumption of his unwillingness or inability to act as a parent." A.D. v. R.P., 345 So. 3d 657, 669 (Ala. Civ. App. 2021). Thus, we will examine

13

the evidence to determine whether the presumption arising under § 12-15-319(d) was rebutted by the evidence presented to the juvenile court.

As noted, the father did not attend the March 2024 trial. His attorney presented no evidence on his behalf. The testimony of the child established that the father was not currently able to perform the duties of a parent because, she said, he did not have the means to support her and did not have his own residence or automobile. The father's attempts to maintain contact with the child through text and telephone calls are not enough to rebut the presumption that the father is unable or unwilling to meet his obligations as a parent.

Because the father abandoned the child, the juvenile court was not required to determine whether viable alternatives to the termination of his parental rights existed.[2] See W.W. v. H.W., 384 So. 3d 663, 670 (Ala.

---

[2]We note, however, that DHR presented evidence indicating that it had considered the paternal relatives that the father had provided to them and that neither of those paternal relatives was a viable relative resource. DHR rejected the paternal grandmother because she had indicated findings for abuse dating from 2002 and 2004, and the paternal aunt, although initially interested in seeking custody of the child, had declined to do so after an argument with the father.

Civ. App. 2023). As we explained in W.W., "'"[b]y abandoning [his] child, [the father] 'lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating [his] parental rights.'"'" 384 So. 3d at 670 (quoting T.T. v. C.E., 204 So. 3d 436, 439 (Ala. Civ. App. 2016), quoting in turn L.L. v. J.W., 195 So. 3d 269, 274 (Ala. Civ. App. 2015), quoting in turn C.C. v. L.J., 176 So. 3d 208, 217 (Ala. Civ. App. 2015)). Because the father abandoned the child, the juvenile court was not required to consider whether maintenance of the status quo would be a viable alternative to the termination of the father's parental rights, and it erred in doing so.[3]

---

[3]The juvenile court specifically relied on T.W. v. Calhoun County Department of Human Resources, 391 So. 3d 306, 316 (Ala. Civ. App. 2023), in its judgment. We held in T.W. that maintaining the status quo is a viable alternative when the record lacks evidence indicating that a special-needs child will likely achieve permanency through adoption and when the evidence reflects that a beneficial bond between the child and a parent exists and should be preserved. Although the child in this case would, by virtue of her age, be a "special-needs child," see Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06 (defining a "special-needs child," for the purposes of subsidized adoption, as, among other things, a child who is over five years of age), the facts of this case are starkly different than those presented in T.W. The father in the present case does not have a beneficial relationship with the child worth preserving, having abandoned her for a period of years before the child took steps to locate him; the child testified that she did "not really" desire to maintain

We have further explained, however, that, even when a parent has abandoned his or her child, a juvenile court must still "consider whether the termination of the [parent's] parental rights would serve the child's best interest." W.W., 384 So. 3d at 670. As Morgan argues, the evidence presented to the juvenile court supports the conclusion that termination of the father's parental rights is in the child's best interest. The child has been in DHR's custody for nearly six years. The child has never had a beneficial relationship with the father, with whom she likely had had no contact before November 2023. The evidence indicates that the father lacks the means to support the child; according to the child, the father does not have a residence, does not have an automobile, and might not even have employment. The child testified that she did not desire to maintain contact with the father and that she instead desired to be adopted. Foote testified that the child is adoptable and that DHR is actively seeking a prospective adoptive home for her, even having had the child attend home visits with two potential adoptive parents. The

---

a relationship with the father; and the child stated that she desired to be adopted and "move past all that."

16

child testified that S.L., who she described as a support to her, had completed foster-care classes in furtherance of potential adoption. Accordingly, we agree with Morgan that the evidence does not support the juvenile court's conclusion that the child's best interest would not be served by termination of the father's parental rights.

In conclusion, the juvenile court's judgment fails to apply the rebuttable presumption arising under § 12-15-319(d) that the father is unable or unwilling to serve as a parent. The evidence, which indicated that the father does not have the means to provide for the child, does not support a conclusion that that presumption was rebutted. In addition, the juvenile court's finding that the child's best interest would not be served by termination of the father's parental rights is not supported by clear and convincing evidence. Accordingly, we reverse the judgment of the juvenile court, and we remand the cause for the juvenile court to enter a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., and Hanson, Fridy, and Lewis, JJ., concur.

17