Rel: March 21, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0643

_____

## A.T.

### v.

## W.T.

_____

## CL-2024-0644

_____

## A.T.

### v.

## A.M.

## Appeals from Tuscaloosa Juvenile Court
## (JU-17-520.03 and JU-17-643.03)

LEWIS, Judge.

A.T. ("the father") appeals from judgments entered by the Tuscaloosa Juvenile Court ("the juvenile court") terminating his parental rights to K.T., who was born in September 2016, and to G.R., who was born in November 2017 (sometimes collectively referred to as "the children"). We affirm the judgments of the juvenile court.

<u>Procedural History</u>

On October 27, 2023, A.M. filed in the juvenile court a petition seeking to terminate the parental rights of the father and of S.M. ("the mother") to G.R. That case was assigned case no. JU-17-643.03. On October 30, 2023, W.T. filed in the juvenile court a petition seeking to terminate the parental rights of the father and of the mother to K.T. That case was assigned case no. JU-17-520.03. A trial on both petitions was held by the juvenile court on June 11, 2024, July 9, 2024, and July 23, 2024. On July 24, 2024, the juvenile court issued separate but almost identical judgments terminating the father's parental rights to the children. The juvenile court's judgments stated, in pertinent part:

> "2. [A.M. and W.T.] established by clear and convincing evidence that the Mother and Father abandoned the child[ren] as defined in Ala. Code 1975[,] §12-15-301(1) and the Mother and Father failed to rebut the presumption that

2

the parent[s] [are] unable or unwilling to act as a parent when the child[ren] ha[ve] been abandoned. <u>A.D. v. R.P.</u>, 345 So. 3d 657, 669 (Ala. Civ. App. 2021). Even if the Mother and Father are not found to have abandoned the child[ren], the Court finds by clear and convincing evidence that the Mother and Father are unable to discharge his and her responsibilities to and for the child[ren] and that the conduct or condition of the Mother and Father render the Mother and Father unable to properly care for the child[ren] and that such conduct or condition is unlikely to change in the foreseeable future.

"3. Further, because of the finding of abandonment, the parental rights of the Mother and Father may be terminated without having to consider and exhaust all viable alternatives. <u>A.D. v. R.P.</u>, 345 So. 3d [at] 669. Even if the Mother and Father are not found to have abandoned the child[ren], having considered the evidence presented, specifically including, but not limited to the Mother's consent; the child[ren]'s lack of any bond with the Mother and Father; the child[ren]'s lack of any contact with the Mother and Father since at least 2019; the fact that the child[ren] w[ere] removed from the parent's custody …; the lack of any beneficial aspect to the relationship between the Mother and Father to the child[ren]; the Mother's conviction to a felony charge of child abuse with th[e] child[ren] as the victim[s] …; the Father's conviction to a charge of reckless endangerment with [one of the] child[ren] as the victim; the unexplained serious physical injury to the child[ren] that would indicate that the injuries are the result of the intentional conduct or willful neglect of the Mother and the Father; [A.M. and W.T.]'s bond with the child[ren] and desire to adopt the child[ren]; the child[ren]'s need for permanency and stability; and the potential benefit to the child[ren] of a permanent parent-child relationship with [A.M. and W.T.]; the Court finds by clear and convincing evidence that there are no viable alternatives. <u>See</u> <u>S.N.W. v. M.D.F.H.</u>, 127 So. 3d 1225 (Ala. Civ. App. 2013); <u>J.S. v. J.C. and C.C.</u>, 219 So. 3d. 666 (Ala. Civ. App, 2016); <u>J.D. v. E.R.</u>, 266 (Ala. Civ. App. 2018); <u>see also</u> <u>J.G. v.</u>

3

Lauderdale County D.H.R., [379 So. 3d 444] (Ala. Civ. App. 2023) (in which the main opinion distinguished the situation in J.G. from the situation in S.N.W. noting that there was no relationship between the father and child in S.N.W. since infancy and there was no adoptive resource in J.G. and that the juvenile court in J.G. was not asked to 'balance the benefits to the children of adoption … against the alternative of maintaining the status quo.' (citations omitted)).

"4. Based upon the clear and convincing evidence presented and considering the best interests of the child[ren], [A.M. and W.T.]'s Petition[s] to Terminate Parental Rights [are] hereby granted. …"

The juvenile court further awarded the permanent care, custody, and control of G.R. to A.M. and of K.T. to W.T.  On August 6, 2024, the father timely filed his notices of appeal to this court.[1]

Evidence

The father and the mother were married on September 25, 2015. The father testified that, on October 4, 2017, a pipe ruptured in their home and therefore, he asked A.M., the father's relative by marriage, to babysit K.T.  A.M. testified that, when she removed K.T. from her car seat, A.M. noticed how small K.T. was.  A.M. testified that

"normally when you pick up a one-year-old baby, you can pick her up and put her on your hip and they're gonna hold their

---

[1]The mother did not appeal the juvenile court's judgments terminating her parental rights to the children.  Therefore, this opinion concerns the father's rights only.

self up and be just fine, she was not able to do that, that's why I realized how small she was, because I picked her up to carry her inside and she just kind of, like, fell over [be]cause she couldn't hold herself up."

The next morning, as a result of K.T.'s condition, A.M., along with her mother W.T., brought K.T. to an office of the Tuscaloosa County Department of Human Resources ("DHR"). A DHR employee instructed A.M. and W.T. to take K.T. straight to the hospital. W.T. testified that K.T. was wearing newborn size diapers and that she could feel K.T.'s ribs. Further, W.T. testified that K.T. was not able to hold herself up for a long time and appeared weak; W.T. stated that K.T. was not able to walk or vocalize at all.

Dr. Karen Burgess, a doctor at University Medical Center, testified that she first saw K.T. on October 6, 2017, the day after the child presented to the emergency room. Dr. Burgess initially observed that, compared to other children K.T.'s age, K.T. seemed to be significantly underweight and malnourished and unable to perform typical activities. In her records, Dr. Burgess described K.T. as "emaciated." Dr. Burgess further stated that the notes from K.T.'s emergency-room visit the previous day described K.T. as "cachectic," which, according to Dr. Burgess, meant that K.T. was wasted and emaciated. Dr. Burgess

testified that she observed that K.T. did not seem to have the strength to engage in activities that a typical 12 or 13-month-old child could do. According to Dr. Burgess, K.T. "could smile weakly, she could lift her head a little bit, she had some purposeful movements, but she was unable to sit. She was unable to stand or walk."

Dr. Burgess testified that K.T.'s weight on October 6, 2017, was 12.6 pounds, which, according to Dr. Burgess, is the average weight of an infant that is two-and-a-half months old. Dr. Burgess also noted that K.T.'s weight on October 6, 2017, reflected a 1.7-pound weight loss from K.T.'s weight that was recorded by her pediatrician's office on June 30, 2017. According to Dr. Burgess, K.T. should have weighed approximately 16 pounds had she continued her growth trajectory from the visit with her pediatrician. On October 6, 2017, Dr. Burgess diagnosed K.T. with malnutrition, immunization deficiency, and developmental delay. When asked what happened to K.T. according to her growth chart, Dr. Burgess testified

> "[s]omething happen[ed] to her from the time that she saw [her pediatrician] on June the 30th of 2017 and then the time that I first saw her on October the 6th of 2017 such that she lost a significant amount of weight, which I think amounts to about twelve percent of what her body weight had been."

6

Dr. Burgess testified that K.T.'s pediatrician had not noted any medical illnesses, conditions, or anything that would explain what happened after June 30, 2017. Further, Dr. Burgess testified that she found no medical abnormalities, any conditions, or genetic issues that would explain the change in the child's condition between June 30, 2017, and October 6, 2017.

A.M. testified that, after she and W.T. returned home from the hospital, DHR contacted W.T., and she obtained custody of K.T. W.T. testified that, when K.T. was 13 months old, she was wearing a clothing size of newborn, 0 to 3 months. According to W.T., though, after she obtained custody of K.T., K.T. gained weight every month thereafter. W.T. testified that the only thing she was doing was feeding K.T. and that K.T. had never received a medical diagnosis that would have explained why she had not gained weight or failed to thrive while in the care of the mother and the father.

Dr. Burgess testified that, at a visit on November 6, 2017, K.T. weighed 16.3 pounds, which equated to a weight gain of almost 4 pounds since Dr. Burgess had first seen K.T. on October 6, 2017. Dr. Burgess testified that that weight gain "demonstrate[d] that [K.T.]'s body ha[d]

7

the inherent ability to take calories and nutrition and turn it into sustainable growth," which confirmed her diagnosis of malnutrition. Dr. Burgess further testified that the parents had neglected K.T. from June 30, 2017, to October 6, 2017. According to Dr. Burgess, she was never able to diagnose K.T. with any condition that would account for the malnutrition other than simply not being fed. Further, Dr. Burgess testified that the developmental issues that K.T. exhibited were side effects of malnutrition.

According to W.T., K.T. has issues with her eyes to the extent that doctors were worried about her being legally blind in one if not both eyes before she reached the age of 13. However, W.T. said that she had been having K.T. treated at a facility in Birmingham and that she was doing better. W.T. testified that she and her husband had taken care of all medical treatment and expenses for K.T. She testified that neither the mother nor the father had ever offered to pay for any deductibles, copayments, or prescription drugs that were required as a result of K.T.'s malnutrition.

Dr. Lauren Linken testified that she treated G.R. at Cahaba Medical Care when G.R. was one month old. According to Dr. Linken,

the mother brought G.R. in for the first time on November 28, 2017, with concerns about his weight. On that date, G.R. weighed 5 pounds 14 ounces, which was 1 pound 2 ounces less than his birth weight. G.R.'s intra fontanelle also appeared sunken, which, according to Dr. Linken, could have been caused by dehydration. Dr. Linken saw G.R. again on December 1, 2017. G.R. had gained two ounces since the last visit, which Dr. Linken testified seemed appropriate; however, Dr. Linken was still concerned that G.R. was not back to his birth weight.

On December 11, 2017, G.R. was brought in for a weight check and a blood test. Dr. Linken testified that, on that date, a triage medical assistant was concerned about G.R.'s appearance and his weight. According to Dr. Linken, another doctor who had seen G.R. that day spoke to Dr. Linken with concerns about G.R. and asked that Dr. Linken see G.R. in the exam room. Dr. Linken testified that she was immediately concerned when she saw G.R. She testified that G.R. "was very small, he looked gray, and he felt cold … my initial concern was, there's something wrong here. This is not how this child should look." Dr. Linken stated that she did not observe G.R. cry or make noises. She indicated in G.R.'s records that he had no skin turgor, which meant that the skin had lost

its elasticity and titration. When asked why an infant would feel cold, Dr. Linken testified that "infants usually keep their heat by the amount of fat that they have. And so, if a baby has lost a lot of weight, they usually don't have fat to keep them warm. And so, then they have trouble regulating their temperature and can have a low body temperature." Dr. Linken further testified that she was concerned that, if she sent G.R. home, his condition would continue to deteriorate and he could possibly die. Dr. Linken suspected that the child had been neglected. Based on her concerns, Dr. Linken recommended that G.R. be transported by ambulance to Children's Hospital for evaluation.

According to Dr. Linken, there was no explanation for G.R.'s lack of weight gain other than neglect. Dr. Linken further testified that G.R.'s Children's Hospital records confirmed her suspicion of neglect, and her opinion was that G.R. had been neglected. According to Dr. Linken, Children's Hospital confirmed that G.R. was dehydrated and hypothermic (had low body temperature) and that he was observed to have an early stage 1 sacral decubitus ulcer. Dr. Linken testified that the ulcer on G.R.'s sacrum was concerning because that type of ulcer is usually formed by pressure. Dr. Linken testified that she "was concerned

that no one was picking the child up and that he was laying on his back, which could cause a pressure ulcer to form if he's not moving." She testified that she had never seen such an ulcer on an infant. Dr. Linken further testified that G.R.'s medical chart indicated that the nurses had to continually wake the parents up and remind them to feed G.R. even though he was crying and upset. The mother disputed those records.

Dr. Linken testified that, if the mother had complied with feeding recommendations, then she would not have expected G.R. to lose weight. According to Dr. Linken, while G.R. was in the hospital from December 11, 2017, to December 18, 2017, he gained one pound. Dr. Linken testified that, if G.R. had been fed appropriately, the hospital visit would not have been needed.

Alisha Williams, a social worker with DHR, testified that she was assigned to work with the children in December 2017. According to Williams, the mother and the father were both "indicated" for "neglect and inadequate supervision; neglect, inadequate food; neglect, inadequate clothing, personal hygiene; and … neglect, other risk of serious harm." Williams testified that G.R. was initially placed in foster care, but A.M. obtained custody of him in November 2018.

Williams testified that DHR offered services to the mother and to the father. Specifically, DHR offered the mother and the father psychological evaluations; the mother and the father completed those evaluations in February 2018. The mother introduced into evidence a certificate of completion reflecting that she and the father attended parenting classes with Tuscaloosa One Place in February 2018. According to Williams, she included in the mother's and the father's individualized service plans ("ISP") that they should both complete counseling; however, the mother and the father did not cooperate in counseling while she had the case. She testified that the mother and the father wanted to use their own counselor rather than one provided to them by DHR. However, she never received information that they had obtained a counselor.

Williams testified that the mother and the father were consistent with their supervised visitation. She testified that, in 2020, the mother and the father's in-person visitations were discontinued because of the COVID-19 pandemic. The parents were offered visitation with the children via videoconferencing; however, both the mother and the father

declined those visits. The father denied having refused visitation via videoconferencing.

According to Williams, the mother contacted her in August 2020 requesting visitation. Williams testified that she completed a referral to Family Dynamics for the mother and the father to resume supervised visitation; however, she was informed that the mother and the father never contacted the provider. According to Williams, the mother and the father last visited with the children in June 2019.

Williams testified that, between 2018 and 2022, she was not aware of either the mother or the father requesting the juvenile court for visitation or complaining about the lack of visitation. Further, according to Williams, she never had a conversation with the mother or the father in which they accepted any responsibility for the reasons the children came into the care of DHR. Williams testified that she did not think it would be a good idea for the children to be forced to visit with the mother and the father who had abused them.

According to Williams, from December 2017 until she stopped working the case in July 2022, she regularly visited the children in their placements at least once a month. Williams testified that the children

"are spoiled, they have everything -- had everything and beyond what they needed and wanted. They were lovable children, they were always respectful, all of their needs were met, overly met, even if there are needs that may not have been met, they made sure to meet those needs. So they were well taken care of."

Further, Williams testified that there was a strong bond between the children and their respective custodians, W.T. and A.M., and the children see their respective custodians as their parents.

Dajah Benson, a caseworker with DHR, testified that she has been assigned the children's case since July 2022. Benson testified that she sees the children in their placements once per month and has observed that the children "are very bonded" with their custodians and that she "can tell that they feel completely safe … [and] appear to be very happy children in the households."

According to Benson, the mother and the father had not visited the children since she had had the case. Further, Benson testified that neither the mother nor the father had attempted to contact her about the children since their last ISP meeting in November 2023. She testified that she thought that it would be detrimental to the children's growth and mental health to be removed from their respective placements because they had been in those placements for so long.

14

Benson testified that the father was banned from the DHR building because of allegations that the father had made threats. Certified copies of the convictions of the mother and the father, which were introduced into evidence, reflect that the mother and the father were both indicted on two counts of felony child abuse. The father was allowed to plead guilty to reckless endangerment, a misdemeanor, with respect to one of the children. The mother pleaded guilty to two felony counts of child abuse (one count for each child), has served part of a split sentence, and is currently on probation.

Dr. Kathleen Ronan, a licensed psychologist, testified that she evaluated the father in 2018 and 2023 and that she evaluated the mother in 2018. Regarding the mother, Dr. Ronan offered a provisional diagnosis of mild or major neurocognitive disorder, provisional unspecified anxiety disorder, and provisional unspecified depressive disorder. Dr. Ronan testified that, at the time she last met with the father in November 2023, he maintained that neither he nor the mother had done anything wrong. Moreover, he was still in a relationship with the mother. According to Dr. Ronan, the father

> "has some very strong defense mechanisms that cause him to have a certain belief set and he can be rigid in his belief set.

He would first therapeutically have to overcome the defense mechanisms enough to be able to hear what he needs to do to shift and change. … This would require deep psychotherapy from a trauma specialist who has experience with dissociation … and some experience with neurocognitive disorders. If he fully committed himself to such a type of psychotherapy, I would be looking at about two years to make significant enough improvements."

Further, Dr. Ronan testified that

"[w]hen I saw [the father] in 2023, I -- again, based on the information I have, I could not appreciate that there had been significant positive changes for him, he was basically the same person as the person I saw in 2018. … If he had made significant improvements, then my findings would have been different."

According to Dr. Ronan, the issues she identified in 2018 had clearly not been resolved by the time she met with the father again in 2023. When asked whether the father had the ability to exercise protective capacity over the children, Dr. Ronan testified that "[h]e does except perhaps when it comes to [the mother]."

W.T. testified that the last time the mother and father made an effort to visit with K.T. was in 2019. According to W.T., neither the mother nor the father have seen K.T. in five years. W.T. testified that, during the COVID-19 pandemic, she was willing to facilitate videoconference visitations with the mother and the father as

recommended by DHR; however, neither the mother nor the father initiated a single videoconference call. W.T. further testified that she offered to meet the mother and the father at any park convenient to them so they could visit with K.T., but neither the mother nor the father accepted her offer.

W.T. testified that, during a visitation, the mother became extremely angry because K.T. had called W.T. "momma." She testified that the mother grabbed K.T.'s arm with her fingernails, yanked her, and said "I'm your momma." According to W.T., the mother left marks on K.T., and K.T. clung to W.T. even more thereafter. W.T. testified that, during visits

> "[K.T.] would cry so much until she turned red, you could see her veins poking all out in her and it would physically make her sick, she would be screaming and hitting and punching and I['ve] never seen her act like, but it was the only people she knew dropping her off with three complete strangers and she was terrified."

W.T. testified that K.T. has been in her care since she was 13 months old; she is now 8 years old. Further, W.T. testified that it was her intent to adopt K.T. According to W.T., the father bought two pairs of pants, a shirt, a jacket, a hat, two pairs of shoes and some gloves as Christmas presents for K.T. in 2023. W.T. testified that those presents

17

were the only contributions the father made to K.T. over the last eight years.

A.M. testified that, since obtaining custody of G.R. in 2018, there had been little interaction between G.R. and the mother and father. She testified that the mother and father had not visited G.R. since 2019. A.M. testified that the father had bought G.R. clothes and Christmas gifts in 2023 and had offered to help support G.R. However, A.M. testified that the father never bought her any other items. According to A.M., the mother never paid any support for G.R. and never called to ask if G.R. needed anything. A.M. testified that, based on previous conversations she had with the mother about the father becoming aggressive and breaking things, she is concerned about supervising visitation.

A.M. testified that G.R. was very smart, received all "Ps," which stands for "proficient," in school and was reading at almost a second grade level. According to A.M., G.R. was healthy and was meeting developmental milestones. She testified that she and W.T. lived close to each other and that G.R. and K.T. were able to interact with each other almost daily.

A.M. testified that, if her petition to terminate parental rights were granted, she planned to adopt G.R. According to A.M., she had been employed by Wal-Mart for three years and earned $19 per hour. A.M. testified that she had adequate housing for G.R., had the income and ability to support G.R. as she had done for the last five years, and was able to continue providing for G.R. without support.

According to the mother, she fed K.T. a specialized formula every three to four hours. She testified that she fed G.R. every two to three hours or as much as he would take, and she purchased a supplemental nursing system that allowed G.R. to take both a bottle of formula and breast milk at the same time. The mother testified that she tried her best with the children and followed the doctor's recommendations. She testified that she had no explanation for the allegations of malnutrition. At the conclusion of her testimony, the mother consented on the record that the children were dependent as to her and consented to the termination of her parental rights to the children.

The father testified that he was employed at Waffle House and earned between $17.50 and $22 per hour. He testified that he normally worked 4 or 5 days per week from 9:00 p.m. to 7:00 a.m. According to the

19

father, he was able to attend very few of the children's doctor's appointments because he was working. The father testified that he did not have any concerns with K.T.'s health while she was living with him and the mother. He testified that he thought her size was adequate because she was born prematurely.

According to the father, he stressed to the mother to take G.R. to the doctor twice a week to try to find out why he was not gaining weight properly. The father testified that he noticed a problem with G.R. but did not go to the doctor with him because he was working to provide for the family. He testified that he relied on the mother to inform him of what the doctor said. The father acknowledged that, shortly before he and the mother had G.R., they had lost custody of K.T. for the same reason they lost custody of G.R.

The father testified that visitation with the children had been suspended at one point because DHR accused him and the mother of putting lice in K.T.'s hair. According to the father, it took approximately six months to clear that issue up with DHR. The father testified that, after the COVID-19 pandemic ban was lifted, he went to court to obtain visitation but that he was always told that he had something else to do

to resume visitation with the children. The father testified that he completed parenting classes in 2018 and in 2023; he submitted certificates of completion from those classes as evidence. Further, the father testified that he began seeking a counselor in 2018 and that he attended counseling from the beginning of 2023 until a few months before the trial.

The father acknowledged that he was charged with felony child abuse. The father testified that he pleaded guilty to reckless endangerment. He testified that he believed that the reckless endangerment charge indicated that he was too busy working to notice anything wrong with the children but that he did nothing to harm the children directly. According to the father, he filed for a divorce from the mother because the mother admitted to harming the children. However, even though he and the mother were divorced, the father testified that he was still living in the home with the mother and that he intended to continue living in the home with the mother until she moved out.

The father testified that he did not believe that K.T. lost weight between August 2017 and September 2017. When asked about a photograph of K.T. taken at the DHR office on October 5, 2017, the father

testified that the picture was photoshopped. The father testified that he did not notice any large ulcers on G.R. and that he did not believe that G.R. was in a medical emergency at the time he was transported to Children's Hospital. The father maintained at trial that he believed that nothing was wrong with the children.

## Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."

"'KGS Steel, Inc. [v. McInish], 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].

22

"'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion .'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., 399 So. 3d 287, 290-91 (Ala. Civ. App. 2024).

Discussion

I.

On appeal, the father first argues that the record does not contain sufficient clear and convincing evidence that he abandoned the children

23

or that other specified grounds for termination existed. Section 12-15-

319, Ala. Code 1975, provides, in pertinent part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of [the] child[ren] [is] unable or unwilling to discharge [his] responsibilities to and for the child[ren], or that the conduct or condition of the parent[] renders [him] unable to properly care for the child[ren] and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child[ren]. In determining whether or not the parent[] [is] unable or unwilling to discharge [his] responsibilities to and for the child[ren] and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
>
> > "(1) That the parent[] ha[s] abandoned the child[ren], provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child[ren] with the parent[].
> >
> > "....
> >
> > "(6) Unexplained serious physical injury to the child[ren] under those circumstances as would indicate that the injuries resulted from the intentional conduct or willful neglect of the parent.
> >
> > "....
> >
> > "(11) Failure by the parent[] to maintain consistent contact or communication with the child[ren].

24

"....

"(13) The existence of any significant emotional ties that have developed between the child[ren] and [their] current foster parent or parents, with additional consideration given to the following factors:

"a. The length of time that the child[ren] ha[ve] lived in a stable and satisfactory environment.

"b. Whether severing the ties between the child[ren] and [their] current foster parent or parents is contrary to the best interest of the child[ren].

"c. Whether the juvenile court has found at least one other ground for termination of parental rights."

Section 12-15-301(1), Ala. Code 1975 defines "abandonment" as

"[a] voluntary and intentional relinquishment of the custody of [the] child[ren] by a parent, or a withholding from the child[ren], without good cause or excuse, by the parent, of his … presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

The father argues that the record on appeal does not support the juvenile court's finding that the father abandoned the children. However, there was evidence indicating that the father had not visited with or

spoken with the children since 2019. There was evidence indicating that the father declined to visit with the children via videoconferencing during the COVID-19 pandemic. Although the father disputed that evidence, this court has held that, when reviewing a termination-of-parental-rights judgment,

> "an appellate court will review factual findings of the juvenile court based on ore tenus evidence with a 'presumption of correctness' because the trial court had the benefit of 'observing witnesses … as they testified, and, therefore, [the juvenile court] was able to assess their demeanor and credibility.'"

P.G. v. J.H., [Ms. CL-2023-0828, Aug. 9, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024) (quoting J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1195 (Ala. Civ. App. 2007)). Here, the juvenile court was in the best position to determine the credibility of the witnesses and could have determined that the father had failed to visit with the children since 2019 and had declined to participate in videoconference visitation with the children. We conclude that the juvenile court had sufficient evidence to support a finding that the father abandoned the children and a finding that the father failed to maintain consistent contact or communication with the children. See § 12-15-319(a)(1) and (11), Ala. Code 1975. Further, there was sufficient evidence to support the juvenile court's

26

determination that the father failed to overcome the rebuttable presumption that he was unable or unwilling to act as a parent due to his abandonment of the children. See § 12-15-319(d), Ala. Code 1975.

A.M. has exercised custody of G.R. since November 20, 2018. K.T. has been in W.T.'s care since she was 13 months old; she is now 8 years old. Williams testified that there was a strong bond between the children and their respective custodians and that the children saw the custodians as their parents. Benson testified that she had observed that the children "are very bonded," and that she "can tell that they feel completely safe … [and] appear to be very happy children in the households." Further, Benson testified that it would be detrimental to remove the children from their respective custodians. Therefore, the juvenile court had evidence that significant emotional ties existed between the children and their custodians, that severing those ties would be contrary to the best interests of the children, and that at least one other ground for termination of parental rights existed. See § 12-15-319(a)(13), Ala. Code 1975. Thus, the juvenile court had before it clear and convincing evidence to support termination of the father's parental rights.

The father argues, without citation to authority, that the juvenile court erred in determining that the children had been subjected to "unexplained serious physical injury." However, regardless of whether the children's malnourishment or the ulcer on G.R. constituted an "injury," we conclude that the juvenile court properly relied on the evidence indicating that, due to the neglect of the mother and the father, both the children suffered from malnourishment and G.R. suffered an ulcer on his sacrum. The factors set forth in § 12-15-319(a) are not exhaustive.

Based on the foregoing, we conclude that the juvenile court had before it clear and convincing evidence to support a termination of the father's parental rights.

## II.

The father next argues that the record does not contain sufficient clear and convincing evidence that there were no viable alternatives to terminating his parental rights. However, because we have found that the juvenile court had sufficient evidence to support a finding that the father abandoned the children, consideration of viable alternatives is not required. See D.M. v. Jefferson Cnty. Dep't of Hum. Res., 232 So. 3d 237,

242 (Ala. Civ. App. 2017) ("'[B]y abandoning [his children], [the father] "lo[ses] any due-process rights that would have required the juvenile court to explore other alternatives before terminating [his] parental rights.'" (quoting <u>L.L. v. J.W.</u>, 195 So. 3d 269, 274 (Ala. Civ. App. 2015), quoting in turn <u>C.C. v. L.J.</u>, 176 So. 3d 208, 217 (Ala. Civ. App. 2015))).

<u>III.</u>

Finally, the father argues that the record does not contain sufficient clear and convincing evidence that the children's best interests would be served by terminating the father's parental rights. We note, however, that there was evidence presented to the juvenile court that both Dr. Linken and Dr. Burgess found that the children had been neglected or abused by the mother and the father. That neglect and abuse resulted in the father being indicted on two counts of felony child abuse, which was reduced to one count of reckless endangerment. Further, there was evidence presented to the juvenile court that the father has not visited with or spoken to the children since 2019. Evidence was presented that the children were bonded with their respective custodians who wish to adopt the children. Therefore, the juvenile court had clear and convincing evidence that the best interests of the children would be

29

served by terminating the parental rights of the father to the children in order for the children to achieve permanency through adoption.

Based on the foregoing, the judgements of the juvenile court terminating the parental rights of the father to the children are affirmed.

CL-2024-0643 -- AFFIRMED.

CL-2024-0644 -- AFFIRMED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.